## THE SONDERBORG.

### No. 5063.

District Court, E. D. Virginia.
April 26, 1930.

J. L. Morewitz, of Newport News, Va., for libelants.

Hughes, Little & Seawell, of Norfolk, Va., for respondents.

GRONER, District Judge.

This is a proceeding by seven foreign seamen against the Danish steamship Sonderborg, claiming wages and penalties, and, as to one of their number, reimbursement for expenses incurred by him in attempting to be cured of syphilis. Exceptions to the jurisdiction were overruled, and the case is now submitted on the merits.

The Sonderborg is a Danish ship. The libelants are foreign seamen, two of whom are from Denmark, one from Holland, one from Germany, one from Sweden, and two from Norway. They were properly signed on board at New Orleans, July, 1929, the articles providing for a voyage, "New Orleans via ports to West Indies and further and return to U. S. A. Final discharging port in U. S. A." The ship went to the West Indies where she loaded cargo, and thence to Canadian ports, where she discharged. No dispute or misunderstanding of any nature occurred between libelants and the ship up to the time of arrival at Halifax, August, 1929. There, it appears, some doubt arose as to the destination thence of the ship. No orders had been received, and it was believed by the

master and by the seamen that she might be sent to some European port. Libelants, or some of them, interviewed the master, but he was as much in the dark as they, and could give no information. They then appealed to the Danish consul with a view to obtaining their discharge at Halifax, or some other Canadian port, and were informed that under the Danish law they were not entitled to demand a discharge, nor a change in the articles, but that their duty was to continue by the ship. The master in turn assured them, or some of them, that if the ship went to Europe, and they were there discharged, their expenses, etc., back to the United States would be paid. This assurance was unsatisfactory for the reason, frankly explained by them, that they were unwilling to be discharged in any European port, since, in that instance, they could not return to the United States except under the quota law, or by getting berths on a vessel on the basis of the European wage standard; whereas, if they returned to the United States on the Sonderborg, they could remain in the United States as seamen, and continue to ship on foreign round-trip voyages on the American pay standard. They thereupon sent protests to the Danish consul general at Montreal, who, in all respects, sustained the position of the local consul, whereupon they returned aboard ship, refused to work, and notified the master that they would not further carry out the articles. The master thereupon had them arrested, and placed in jail, charged with mutiny. The Halifax court dismissed the charge of mutiny, but held libelants on the master's statement that he would charge them with desertion, but before this charge could be formally made, the ship was ordered to return to the United States, and the master having communicated this fact to libelants, all hands agreed to return to the ship, resume work, and this was done, and, on September 9, the ship arrived at Norfolk, where, by reason of failure to have aboard a consular stamped crew list, some negotiations with Washington were necessary before the American immigration officials would permit the men to land; but on the 11th, permission was received, and the men were discharged, and the wages due them, as calculated by the master, delivered to the Danish consul at Newport News for delivery to them when they should demand payment.

As originally brought, the libel claimed damages for false arrest and imprisonment at Halifax. At the hearing, this claim was abandoned, leaving only the claim for wages, and penalties, and as to libelant Nielsen, his claim for reimbursement for medical expenses.

On behalf of the ship, it is insisted that since this is a controversy over wages between a foreign master and ship on the one hand, and foreign seamen on the other, this court should not take jurisdiction, but should refer the matter to the decision of the Danish consul. This is undoubtedly the effect of the Danish law. Article 43 of the Seamen's Act of Denmark provides: "If a dispute arises while the ship is abroad between the master and any of the crew about the account of wages or about any conditions of service, the matter shall be laid before the Consul at the first place possible. The decision made by the Consul shall be binding on both parties until the matter can be brought before the court in this Kingdom."

Respondents insist that this provision should be given effect since it is obviously not the policy of the courts of this country to interfere with the internal discipline of a foreign ship. There is nothing new in the point. The circumstances under which this court will take jurisdiction were stated by me in The Roxen (D. C.) 7 F.(2d) 739, affirmed in part Elman v. Moller (C. C. A.) 11 F.(2d) 55. I there held that jurisdiction should always be assumed in any case in which the refusal would result in a denial of justice. In this case, as has been pointed out, libelants were signed on *in* an American port for return, upon the expiration of the voyage, *to* an American port. They intended and intend to remain in the United States as long as they are undisturbed by the immigration authorities, and this, of course, depends upon their compliance with the acts of Congress with relation to foreign seamen. Not only, therefore, would their contract entitle them to a discharge in the United States, but this in fact occurred. To hold, therefore, that their only remedy was by appeal to the courts of Denmark would be a clear denial of justice.

The motion to decline jurisdiction should again be denied, and this brings me to the crux of the case, namely, whether the action of the master of the ship, at the time of their discharge, in deducting from their wages approximately forty dollars each, to cover expenses incurred by him on account of their refusal to work at Halifax, was permissible. It does not appear quite clearly how this sum, aggregating $280, was spent. Presumably, however, it was in connection with the arrest of the men, and the detention of the ship at Halifax. There is some testi-

mony on behalf of libelants that the master, when the arrangement was made with the seamen to return to the ship, agreed that there would be no deduction on this account. However this may be, there is a total absence of any evidence, or indeed any claim, that the men agreed to reimburse the master on account of this, or any other expense, and it is equally true, though the master claims that he received permission from the consul to omit the same, that no proper record of this charge, either in the aggregate or individually, was entered in the ship's log, or that a hearing was had on account of same, or that any of the libelants, except Neilsen, were apprised of the purpose of the master to deduct this sum from their then earned wages. The refusal to work by libelants at Halifax was, in my opinion, unjustifiable, as was their demand that the articles be there changed so that they might properly leave the ship at the final Canadian port of discharge, for even if it be conceded that the shipping articles were indefinite, this was only in respect to that portion providing, "To West Indies and further." Conceding that the use of the word "further" was without effect, the articles could not reasonably and fairly have been construed, by either the men or the ship, as meaning anything else than the return to the United States within a reasonable time. In the dispute in Halifax, the men had been aboard only a little more than a month, and it was fully understood by both master and men that the ship was intending to discharge at two other Canadian ports. There was therefore no justification for the refusal of the men to do duty at Halifax. The fact that the vessel was to make two additional stops in Canada, and to discharge cargo at each, afforded opportunity, after the complete discharge of cargo, for the exercise of any rights they had to refuse to go to Europe if orders to the ship to that effect were received. But as it now turns out, there was never any intention to send the ship abroad, and the voyage from an American port to an American port, as originally understood by all concerned, was precisely what occurred. Their action, therefore, in refusing work before the destination of the ship was known, or the final Canadian port of discharge reached, was without justification, and for this, they were subject, of course, to the forfeitures and penalties legally applicable under such circumstances, but no more. The action of the master of the ship in charging them with an arbitrary amount claimed to represent the loss sustained by their conduct in Halifax was, as I view the case, as unjustified as the action of the men in refusing to work, and since there is added to this, his failure to duly notify them and give them a hearing, as required by both the American and the Danish law, it becomes apparent that his action in deducting this, or any sum, from their wages on their discharge at Newport News was unwarranted, and it is equally clear, I think, that for the two days the men were kept aboard after arrival at Hampton Roads, because of the ship's failure to have the proper consular crew list, they were entitled to receive wages, notwithstanding they did no work. It was not their fault that they were not permitted to land. Their contract continued, and their right to pay continued until their final discharge. The action of the master in deducting two days' pay on this account therefore was without authority.

It will therefore be seen from what has been said above that libelants are entitled to recover their wages according to the terms of their respective contracts, and the delivery of lesser amounts to the Danish consul for their account was wholly ineffective to discharge the obligation of the ship to them.

█ Libelants likewise invoke the Act June 5, 1920, § 32, 41 Stat. 1006 (46 USCA § 599), as the basis of a claim for wages deducted at or about the time of signing on board. The justification for this is that the evidence shows that when the men came aboard at New Orleans, they were badly in need of clothing, and the ship carrying no slop chest, what was absolutely essential in this respect was ordered at their request, paid for by the ship, and allotted according to their several needs. When they had earned sufficient wages to take care of this expense, the same was charged against them. I do not think that anything done in this respect violates the statute. See The Ella Pierce Thurlow (D. C.) 18 F.(2d) 675. There is evidence, however, that in the case of one of them $20 were paid to his boarding house keeper on account of an indebtedness incurred by him while ashore. He does not dispute the correctness of the item, nor the fact that he requested that payment should be made, but the language of the statute is so embracing that it seems to me this advancement is prohibited under its terms, and is recoverable by the seaman.

█ Libelants say that since the wages due them were not promptly paid, the section of the act (R. S. § 4529) imposing penalties for failure in that regard applies. The provisions of this section are as follows: "The

master or owner of any vessel * * * shall pay to every seaman his wages * * * in case of vessels making foreign voyages, * * * within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens; and in all cases the seaman shall be entitled to be paid at the time of his discharge on account of wages a sum equal to one-third part of the balance due him. Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court. * * *" R. S. § 4529; Act March 4, 1915, c. 153, § 3, 38 Stat. 1164 (46 USCA § 596).

If the provisions of this statute are applicable to the case of foreign seamen on a foreign vessel, it follows, I think, from what I have already said, that the penalty prescribed therein should be imposed. I have frequently had occasion to say that this statute was passed to protect seamen from unjust and unwarranted refusal on the part of the master to pay wages when due, and in all such cases where the facts justified it, I have applied it, but this is the first case in this court, so far as I am now advised, in which it has been sought to extend its provisions to foreign seamen on a foreign vessel, and the statute ought not to be so construed unless it plainly appears that this was the intention of the Congress.

The section, as it is found in the present text, is in substantially the same language as the original enactment of July 20, 1790, except that by amendment passed December 21, 1898 (30 Stat. 756, § 4), the payment of a sum equal to one day's pay for each day's delay in payment was substituted for the payment of a sum equal to two days' pay for each day, not exceeding ten, during which the payment should be delayed; but by Act of March 4, 1915, c. 153, § 3, 38 Stat. 1164, the penalty was changed back to two days' pay for each day of the delay, and it is now insisted by libelants that section 4 of the Act of March 4, 1915 (38 Stat. 1165, as amended by Act June 5, 1920, § 31, 41 Stat. 1006; R. S. § 4530 [46 USCA § 597]) should be read in conjunction with section 3 (R. S. § 4529), and that the proviso found in the latter should be read into the former. Section 4, commonly known as the part-payment statute, makes it the duty of the master, on demand, to pay the seaman one-half part of the wages he shall have then earned at every port where such vessel shall load or deliver cargo before the voyage ends, and the proviso referred to makes the statute apply "to seamen on foreign vessels while in harbors of the United States," and provides also that the courts of the United States shall be open to such seamen for its enforcement.

The section has been construed a number of times, and there is no doubt of its validity or its applicability to the case of a foreign seaman on a foreign vessel. Strathearn S. S. Co. v. Dillon, 252 U. S. 348, 40 S. Ct. 350, 351, 64 L. Ed. 607. In the last-named case, it was argued on behalf of the vessel that the purpose of Congress was to limit the benefit of the act to American seamen because the title to the act was "To promote the welfare of American seamen," but the Supreme Court rejected this contention and refused to limit the benefits conferred to American seamen alone. Mr. Justice Day, who delivered the opinion of the court, in passing upon that question, said, "But, taking the provisions of the act as the same are written, we think it plain that it manifests the purpose of Congress to place American and foreign seamen on an equality of right in so far as the privileges of this section are concerned."

In the case of The Roxen (D. C.) 7 F. (2d) 739, 740, referring to the above-quoted language, I said: "A careful examination of the opinion of the Supreme Court in the Strathearn Case convinces me that no more is decided there than that Congress has a right to legislate with regard to foreign ships and foreign sailors in American ports, and that, where the intent of Congress is to place foreign seamen and American seamen on a parity, with the same rights and the same obligations, the federal courts may, constitutionally, enforce such legislation. In section 4 of the Seamen's Act, and in one other section, not material to the issues here, Congress has manifested this purpose in distinct and unequivocal language, but otherwise the law remains unchanged, so far as applicable to foreign ships and foreign seamen."

Unless, therefore, section 3 of the Act of March 4, 1915 and section 4, as amended (R. S. §§ 4529 and 4530) may be read together as one section, and the proviso in the latter, making its terms applicable to foreign seamen, construed as applying equally in the former, it follows that the court in this

case is without authority to include "waiting time" in the decree for wages. The question is not without serious doubt, and, as involved here, appears never to have been decided, except in The City of Norwich (D. C.) 273 F. 304, which was reversed on another ground. But see on this subject The Tairoa, 297 F. 449–451 (C. C. A. 2d), where, for the purpose of argument, it was affirmatively assumed; and see, also, The Cubadist, 256 F. 203, 205, where Judge Grubb, speaking for the Circuit Court of Appeals for the Fifth Circuit, in a case in which the question for decision was what constituted the voyage, and whether it ended at the port of final discharge, or at the port of final destination, said: "Section 4529 [section 3 of the Act of March 4, 1915] and section 4530 [section 4 of the Act of 1915] should be construed together. The former provides for the payment of full wages to seamen; the latter, for half then earned wages at any port, touched by the ship, where cargo is received or discharged. * * * During the progress of the voyage, full wages can only be demanded if half then earned wages are wrongfully denied. The section then reads as follows: 'And when the voyage is ended every such seaman shall be entitled to the remainder of the wages which shall then be due him, as provided in section 4529 of the Revised Statutes.'"

It is this reference in section 4530 to the provisions of section 4529 that gives weight to the argument that the purpose of Congress was to make the two sections read as one. By section 4530, the seaman, foreign or American, is permitted to demand half his earned wages at every port at which the vessel shall load or deliver cargo *before* the voyage is ended, and by the same section, to demand all earned wages due him *when* the voyage is ended, "as provided in the preceding section [4529]." Here the voyage has ended, and the wages are due, and R. S. § 4529 makes it incumbent upon the master or owner either to pay up promptly or suffer a penalty equal to two days' pay for every day during which payment is delayed, "which sum shall be recoverable as wages in any claim made before the court." To confine the recovery in the case of foreign seamen on foreign vessels to earned contract wages only would be to deny to the wording of the statute its ordinary meaning, for the language of R. S. § 4530, is that foreign seamen, at the end of the voyage, may recover wages, in a suit in a federal court, in the manner provided in R. S. § 4529, and

the last-named section by its terms includes the additional amount occurring out of the refusal or delay. There seems to me no escape from the conclusion that the purpose of Congress was to open the federal courts, at least as to these two companion sections, to the suits of foreign seamen equally with American seamen, and to apply the same law, and extend the same benefits to both alike. And if I am correct in so thinking, libelants are entitled to a decree for the amount of wages due them, and to an additional amount for failure of the ship to pay promptly in accordance with the statute. The act provides that this payment, in addition to the amount of the agreed wages, shall begin four days after their discharge, which in this case would be 2 p. m., September 15, 1929. The libel was brought September 16, 1929. Exceptions to the libel were filed October 4, 1929, and the matter was thereafter brought to the attention of the court by counsel for libelants, and the court, having heard the argument of counsel, on November 6th overruled the exceptions. The evidence on behalf of the steamship was taken by deposition, and the case set for trial January 22d on the merits. Five of the libelants, namely, Nielsen, Olsson, Kuntoff, Lubbers, and Sjursen, were then ready with their proof, and submitted their cases. Two of libelants, Mikkelsen and Berentsen, were not then ready, and were not thereafter ready with the proof in their cases until March 27, 1930. The local rule of court provides as follows: "Libels for seamen's wages under section 4529 of the Revised Statutes as amended by the act of March 4, 1915 (ch. 153, § 3), shall have precedence. It shall be the duty of the libelant to call up such a case not later than 10 days after answer or other defence interposed, in default whereof no wages or penalties shall accrue after said 10 days."

The answer, as has been shown, was filed January 11, and since the cases of Mikkelsen and Berentsen were not ready within the 10-day period, the rule would apply to them, and the additional payment provided in R. S. § 4529, stopped as of January 20th, inclusive. In the case of the others, it should run to January 22d, inclusive, being the day of the hearing. The delay since then in filing my conclusions was due, in large measure, to personal reasons with which counsel are familiar, and which it is not necessary to set out at length here.

A decree will be entered on presentation in accordance with the above.

### Memorandum.

The claim of Nielsen for $75 for medical expenses in being treated for syphilis is denied. Whatever may be the liability of the ship to the government for failure to declare him afflicted with this loathsome disease, he is himself equally guilty for failure to declare the fact himself. The statute (USCA, title 8, § 170) is for the protection of the public. He ought not to be permitted to flout it and claim under its terms at the same moment.