## THE ROXEN.

(District Court, E. D. Virginia. February 11, 1925.)

**1. Admiralty ⬤═5—Except as to certain matters of wages, Seamen's Act does not require federal court to take jurisdiction of controversy between seamen and master of foreign ship.**

Except as to certain matters of wages, Seamen's Act March 4, 1915, § 4 (Comp. St. § 8322), does not require federal admiralty court to take jurisdiction of controversies between foreign seamen and master of foreign ship, though occurring in American port, so that as to assuming jurisdiction of a controversy relative to detention on board while in port there is a discretion, and it will not be assumed, except in case of such hardship as to make refusal a denial of justice.

**2. Admiralty ⬤═5 — Extreme conditions for which court should take jurisdiction of controversy between seamen and master of foreign ship held not to exist.**

Extreme conditions for which a federal admiralty court should take jurisdiction of controversy between foreign seamen and master of foreign ship for their detention on board in American port, in view of short and technical nature of detention, the cause thereof, seamen's resort to habeas corpus, and readiness of foreign consul to hear controversy, *held* not to exist.

**3. False imprisonment ⬤═6—Unlawful detention of seamen by defendant's watchmen on dock not shown.**

In a libel against a vessel and a ship and cargo watching company, brought by certain seamen for their detention aboard the vessel, where it appeared that watchmen on the dock employed by the company did nothing more than inform such members of the crew as attempted to come ashore that they must have a pass from officer of vessel, there was no liability on the part of the company.

In Admiralty. Libel by one Elman and others against the steamer Roxen and others. Libel dismissed.

Jacob Louis Morewitz, of Newport News, Va., for libelants.

Hughes, Vandeventer & Eggleston and John W. Eggleston, all of Norfolk, Va., for the Roxen.

Allan D. Jones, of Newport News, Va., for Newport News Ship & Cargo Watching Co.

GRONER, District Judge. This is a libel, filed September 16, 1924, in which the libelant and three others similarly situated seek to recover damages for their detention aboard the steamer Roxen while she was in the port of Newport News, Va., and penalties, under R. S. § 4529, for failure to pay their wages when due and demanded.

[1] Exceptions and a motion to dismiss were filed on behalf of the vessel October 3, and a supplemental libel was filed December 22, 1924. The matter was heard by the court on the motion to dismiss, but, in order to give counsel time to file briefs and the court an opportunity to examine the testimony already taken and such further evidence as might be offered, a decision on the motion to dismiss was postponed until the hearing set for to-day. At the outset the respondents insist that the court ought not to take jurisdiction in this case, because it involves a controversy between foreign seamen, on a foreign ship, in charge of a foreign master.

It has long been the policy of the federal courts to refuse to take jurisdiction in controversies between seamen and the master on a foreign vessel, except in cases of such hardship as would make the refusal a denial of justice. See The Belgenland, 114 U. S. 355, 5 S. Ct. 860, 29 L. Ed. 152; Patterson v. Eudora, 190 U. S. 169, 23 S. Ct. 821, 47 L. Ed. 1002; The Ester (D. C.) 190 F. 216. It is, however, insisted on behalf of the libelants that the right to exercise this discretion has been taken away by the terms of the Seamen's Act of March 4, 1915, c. 153, 38 Stat. 1164, and the case of Strathearn Steamship Co. v. Dillon, 252 U. S. 348, 40 S. Ct. 350, 64 L. Ed. 607, is cited in support of this contention.

The last-named case involved, it is true, a controversy between a foreign seaman and a foreign vessel, but the point decided was that under section 4 of the act, being section 8322, Comp. St. (giving seamen the right to demand and receive one-half of their wages, etc.), jurisdiction had been conferred and should be exercised, at the instance of the seaman, whether American or foreign, by the federal admiralty court. The section in question contains a provision as follows: "That this section shall apply to seamen on foreign vessels while in harbors of the United States, and the courts of the United States shall be open to such seamen for its enforcement." And the Supreme Court, speaking through Mr. Justice Day, said: "The latter provision [as quoted above] is of the utmost importance in determining the proper construction of this section of the act." And again: "But, tak-

ing the provisions of the act as the same are written, we think it plain that it manifests the purpose of Congress to place American and foreign seamen on an equality of right in so far as the privileges *of this section* are concerned." (Underscoring added.)

A careful examination of the opinion of the Supreme Court in the Strathearn Case convinces me that no more is decided there than that Congress has a right to legislate with regard to foreign ships and foreign sailors in American ports, and that, where the intent of Congress is to place foreign seamen and American seamen on a parity, with the same rights and the same obligations, the federal courts may, constitutionally, enforce such legislation. In section 4 of the Seamen's Act, and in one other section, not material to the issues here, Congress has manifested this purpose in distinct and unequivocal language, but otherwise the law remains unchanged, so far as applicable to foreign ships and foreign seamen. From this it follows that, while circumstances may exist rendering it expedient for the courts of the United States to take jurisdiction of controversies arising in American ports between foreigners, extreme conditions should exist to justify so doing.

[2] A brief epitome of the facts developed in the hearing before me in this case will demonstrate, it would seem to me, that this is not such a case. As has been stated, this was a Swedish ship, engaged in a voyage from a Pacific port to Australia, and thence through the Panama Canal to Europe. Libelants signed articles for a voyage to Europe. On the voyage it became necessary that the vessel should stop at Hampton Roads for bunkers. Before reaching this port, Elman, one of the libelants, requested the master of the ship to discharge him when the ship reached Newport News, and the master promised him he would do this if the immigration authorities offered no objection. On the arrival of the ship in Hampton Roads, she was boarded, as is usual, by the immigration authorities, and information was requested of the boarding officer whether Elman would be allowed to land. The officer was unable to answer this question, but promised to advise the captain the next morning before the ship should sail. The ship docked late in the afternoon, and some time before midnight, having received her coal, undocked and anchored in the stream.

The master of the vessel, in the meantime, had been informed by his agent that, in view of the fact he was taking bunkers only, it was not necessary, under the customs regulations, that she should enter and clear, or pay the tonnage tax, unless he changed crews. To avoid, therefore, the necessity of changing crews, through desertion, he employed a watchman to keep the members of his crew on board the few hours he was at the dock. None of his crew requested shore leave of the master, but while the latter was ashore one or two members of the crew, who are among the libelants here, went on the dock, but were advised by the watchman that they would not be allowed to go through the gate.

The following morning, as the ship was about ready to sail, and when the master came ashore to make final arrangements and to get a pilot, and to receive the answer of the immigration officer as to the discharge of Elman, he was served with a writ of habeas corpus, issuing out of a state court, requiring him to produce the bodies of the four libelants in this case, that the court might inquire into the alleged unlawful detention. A hearing upon the petition for the writ was begun that afternoon, concluded the next morning, and the petitioners ordered discharged. They thereupon refused to return on board the vessel, and brought this proceeding. The captain of the vessel, while insisting that they thereby became deserters, on the advice of counsel and to avoid the possible accumulation of a large penalty for nonpayment of wages, paid the wages in full, and was delayed two or three days in obtaining other men and in putting to sea. The Swedish vice consul was at all times ready to hear and decide the controversy growing out of the state of affairs detailed above, but his services were rejected by libelants.

The evidence discloses, in addition to what has already been said, that the treatment of the crew by the officers of the ship was entirely satisfactory to the former until their arrival at this port. Not only was there no complaint of bad treatment, but there was affirmative evidence to the effect that all on board were happy and contented in the relationship which existed. The men who sought an opportunity to go ashore at Newport News testified that their purpose in wanting to go ashore was to buy one of them a package of cigarettes, and the other for some equally trivial purpose. No other hardship was imposed upon them than the requirement that they remain aboard for the three or four hours that the ship was coal-

ing and for the few additional hours that she remained in the stream pending her expected departure. In the events which followed, libelants, in violation of the terms of their contract, refused to return on board the ship and make the passage they had contracted to make.

Out of the fear of the master of the vessel that his owners might be mulcted in a large sum if he failed to pay them their wages, they succeeded in obtaining every dollar that was due them. They were permitted to go back on the ship and get their effects. There was not a particle of evidence that they were subjected to any hardship or abuse. They do not pretend that they asked for permission to go ashore and were refused permission, but assert that, without regard to their obligation to the ship, the mere fact that she was in port gave them the right, without the consent of the officers, to leave her for their own purposes. Of course, it is not contended that they would not thereby have incurred such penalties as were proper for their breach of discipline in absenting themselves from the ship without permission, but that whatever ensued as a result of this was their own lookout, and did not justify their retention, against their wills, on board.

In the view that I take of the whole matter, if it be conceded that this is a case in which jurisdiction should have been assumed, and if it also be conceded that their detention aboard the ship was a violation of their personal liberty, for which they had a right to damages, the quantum of damages, under the circumstances detailed, would have been nominal. In the case of Elman, in view of the captain's promise that he would be discharged at Newport News, I think it follows that the articles were, in effect, changed to read accordingly, and that he was entitled to his discharge.

It is equally true, however, that the captain could not, without violating the law and subjecting his owners to a penalty, have discharged him until the approval of the immigration authorities was obtained. The evidence convinces me that he did all that good faith required in this respect, and before the decision of the immigration officials could be announced to him he was served with the papers in habeas corpus. Under these circumstances, it seems to me perfectly clear that he had a right to leave the decision of the question to the court whose jurisdiction had been invoked by the seamen, including Elman, and that the delay in discharging Elman from the 16th, when the permission of the immigration authorities was obtained, until the 17th, when the state court ordered a discharge in habeas corpus, imposed no hardship of which Elman may complain.

For the reasons stated, the exceptions to the libel and the motion to dismiss are sustained, and a decree will be entered accordingly.

[3] As to the respondents Edward Hornlein and Henry E. Bridgers, partners trading as Newport News Ship and Cargo Watching Company: It follows from what has been said above that the claim against these people has no merit. Their service was in furnishing watchmen on the dock for the few hours that the ship lay alongside. According to the greater weight of the evidence, the watchmen who were furnished did nothing more than to inform such members of the crew as attempted to come ashore that they must have a pass from some officer of the vessel. Only one of them appears even to have gone on the dock, and when informed that a pass was necessary no further effort was made by him either to obtain the pass or to leave the dock. The others made no effort to come ashore at all.

For the reasons stated, the libel is dismissed on the merits as to the Newport News Ship & Cargo Watching Company.