ELMAN et al. v. MOLLER et al.*

(Circuit Court of Appeals, Fourth Circuit. January 14, 1926.)

No. 2372.

1. Admiralty ⊜⟹5—District Court properly refused to take jurisdiction of controversy relating to detention of foreign seamen by master of foreign ship, occurring in American port, where none of them had asked for discharge or payment of his wages.

District Court properly refused to take jurisdiction of controversy relating to detention of foreign seamen by master of foreign ship, occurring in American port, where master put in for bunker coal and wished to sail within 24 hours, and did not wish to run risk of any of his crew overstaying their shore leave, and none of them had asked master for a discharge or for payment of his wages in whole or in part.

2. False imprisonment ⊜⟹6—Seamen's detention pending habeas corpus hearing to secure release held not false imprisonment.

That seamen were detained in custody, pending habeas corpus hearing to secure their release from detention from aboard vessel, held not a false imprisonment, where such course was suggested by judge, and was apparently acquiesced in by everybody to keep things in statu quo.

3. Constitutional law ⊜⟹83(2).

Seamen cannot, when their ship is in port, be held in involuntary servitude.

4. Seamen ⊜⟹24.

Seamen, who received their wages, but two days after they demanded them, could not complain of delay in making payment.

5. Admiralty ⊜⟹5—District Court erred in refusing to take jurisdiction of controversy relating to detention of foreign seaman by master of foreign ship, occurring in American port, where his discharge had been promised him.

District Court erred in refusing to take jurisdiction of controversy relating to detention of foreign seaman by master of foreign ship, occurring in American port, where he had asked for his discharge some time before, and master had promised to give it to him when ship put in at port.

6. Constitutional law ⊜⟹83(2).

Foreign ship cannot, when in an American port, forcibly compel one of its crew, albeit an alien, to serve against his will.

*Certiorari denied 46 S. Ct. 488, 70 L. Ed. —.

**7. False Imprisonment ⬮➩36—Seaman held entitled to $100 damages for detention aboard vessel.**

Seaman *held* entitled to an award of $100 for detention aboard vessel, where he had asked for his discharge, and had been promised it when immigration authorities withdrew their objection to his release, and they had done so.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; D. Lawrence Groner, Judge.

Libel by Ed Elman and others against O. A. Moller, master of the steamship Roxen and others. From a decree dismissing the libel (7 F.[2d] 739), libelants appeal. Reversed and remanded in part, and affirmed in part.

Jacob Louis Morewitz, of Newport News, Va., for appellants.

John W. Eggleston, of Norfolk, Va., and Allan D. Jones, of Newport News, Va. (Hughes, Vandeventer & Eggleston, of Norfolk, Va., on the brief), for appellees.

Before WADDILL, ROSE, and PARKER, Circuit Judges.

ROSE, Circuit Judge. [1] The libelants were all alien members of the crew of the Swedish steamship Roxen, although one of them, Elman, had declared his intention to become a citizen. At various ports on the Pacific Coast of this country or in Australia they had shipped for a voyage, the last part of which was to be from the South Seas to Europe. On the afternoon of September 15, 1924, the ship put into Newport News to get bunker coal and for no other purpose. She tied up at the coal pier at about 5 p. m., was promptly served, and by 11 was again out in the stream. Her master expected to sail the next morning, but when, on that day, the 16th, he went ashore about 10 o'clock in the forenoon, writs of habeas corpus were served on him commanding him to produce on the 17th, the four libelants before a state court judge. Later in the day the libel in this case was filed. By it the libelants sought to recover for false imprisonment from the ship in rem and from her master, owners and the respondents Hornlein and Bridgers trading as the Newport News Ship & Cargo Watching Company in personam, and also from the ship, her master and owners the balance of wages due them and for two days for one during which payment was wrongfully delayed. At the instance of the ship, the hearing of the petitions in habeas corpus was begun on the afternoon of the 16th. The judge

sat until 7 that evening, and resumed his session at 9:30 on the morning of the 17th. He sustained the writs and discharged the petitioners. On the 18th, their depositions were taken in support of their libel, and at 8:30 in the evening of that day they were paid their wages, which they accepted without prejudice to such right, if any, as they had to demand an additional two days for one for improper delay in making such payment. By its final decree, the learned court below declined to take jurisdiction of the libel so far as the ship, her master and owners were concerned, on the ground that none of the libelants were citizens; that all of them had been duly articled seamen on board a Swedish vessel; that the matters of which they complained had their origin in their relation to the ship; and that the Consul of Sweden was ready to hear anything they had to say. He dismissed the libel as against Hornlein and Bridgers finding that the evidence showed that, if they did anything to the injury of the libelants, it was done on land, and therefore outside the jurisdiction of the admiralty.

When or before the ship put in to Newport News, her master learned or supposed that he learned that, if he confined himself to taking on bunker coal and made no changes in his crew, he would not have to enter or clear, and would escape certain not inconsiderable fees and dues. If any of the alien members of the crew went on shore and remained there without the consent of the immigration authorities, the ship would almost certainly be detained in port longer than would otherwise be necessary, and might be subject to a heavy penalty as well. Moreover, as he wished to sail early the next day, he did not want to run the risk of any of his crew overstaying their shore leave. For these reasons he decided not to grant any, and he employed the Newport News Ship & Cargo Watching Company to see that none of his men went on shore without special leave. Some of the libelants did not ask for permission to go ashore; only one of them seems to have attempted to do so, and he was stopped on the wharf by one of the watchmen acting for the Ship & Cargo Watching Company. None of the libelants, Elman excepted, had asked the master for his discharge or for the payment of his wages in whole or in part. With the same exception, none of them had expected to leave the ship at Newport News, but on the contrary had intended to go with her to Europe. Under such circumstances, we think that, as to the three libelants other than Elman, the learned District Judge was right in declining jurisdiction. So far as

they are concerned, the case has been argued before us as if they had demanded their discharge, which they themselves swear they had not done at any time before the hearing of their petition for habeas corpus, or upon the assumption that our laws give a right of shore leave to alien seamen serving on foreign ships and intending to continue in such service. We have not been favored with a reference to any statute which so provides.

[2] When their petitions for habeas corpus were heard, they did say that they wanted to leave the ship and the state court judge, recognizing their right to do so, discharged them from the custody of the master. It is said, however, that, as there was an adjournment over night of the habeas corpus hearing, and as they were detained in custody, there was then a false imprisonment, if there had not been before. It appears, however, that the fact was that such course was at least suggested by the learned judge of the state court, and was apparently acquiesced in at the time by everybody as a common sense way of keeping things in statu quo until the judge and those concerned had found out just what the situation was and what were the rights of the respective parties to the controversy.

[3, 4] The final judgment of the state court court properly held that when their ship was in port, they could not, in our day and generation, be held in involuntary servitude, but that was necessarily all that it could decide. It did not attempt to say that they might not be pecuniarily liable for a breach of a valid contract, precisely as men in all other walks of life are, and it said nothing as to whether any wages were due them, and, if so, how much. It was not until the 16th that any of them in any way asked for their discharge. On the 18th they received their wages in full, without any deduction on account of their apparently civilly unjustified breach of their contract. They certainly cannot complain that there was any improper delay in making payment.

[5, 6] Elman's case differs from the others, in that while the ship was at Panama, he had asked for his discharge. The master had promised to give it to him when the ship put in at Newport News. Almost immediately upon her arrival there, she was boarded by an immigration officer. He was asked whether Elman could be discharged. He said that he could not say until the next day, the 16th. On the latter date, he told the captain that there was no objection to his paying Elman off. Before that time, however, the petition for habeas corpus had been filed. A good deal of the cross-examination of the master and of the testimony of several other witnesses was directed to showing that the master did not intend to let Elman go, and, except for the habeas corpus proceedings, would not have done so. This contention is denied, and there is no means of doing more than guessing as to what would have happened had no legal proceedings been begun. We think, however, that the court below erred in declining jurisdiction in his case. Even a foreign ship cannot, when in an American port, forcibly compel one of its crew, albeit an alien, to serve against his will. If he alleges that such attempt has been made, we believe that an American court is bound to hear his complaint and give him such redress, if any, as he may show he should have.

To what measure of relief was he entitled? On the evening of the 15th, the master could scarcely have done otherwise than to wait upon the immigration authorities. On the morning of the 16th, Elman himself started litigation in the state and federal courts. The master may well have thought it was his duty to produce Elman before the state judge in obedience to the mandate of the writ. When, however, this had been done, the master should have at once told the court that he made no claim further to detain the petitioner. There was no reason why the latter should have been required to go into any hearing. He had asked for his discharge, and had been promised it so soon as the immigration authorities had withdrawn their objection to his release. They had done so. The further attempt to hold him was unjustified. He was not, it is true, humiliated or seriously injured or oppressed, but he may well have been put to some extra expense, and one who unlawfully restrains the liberty of another must answer for it.

[7] We think under all the circumstances, an award of $100 in Elman's favor against the ship, master, and owners will be just.

The courts should act promptly and vigorously to vindicate all the rights of seamen, as well those recently conferred on them, as those which date from time immemorial. We doubt not that even now they will often need all the protection that can be given them. On the other hand, it will be well that those who act for them shall not take them unnecessarily into court or on their behalf set up claims destitute of other than the most purely technical support.

It follows from what has been said that the decree below dismissing the libel, so far as concerns the libelants other than Elman, should be affirmed. That, as to him, it should be reversed, and he should be awarded a de-

cree of $100 against the ship, master, and owner and that so much of the decree below as dismissed the libel against Hornlein and Bridgers, trading as the Newport News Ship & Cargo Watching Company should be affirmed.

Reversed in part; affirmed in part.