47 F.2d 723 (1931)
THE SONDERBORG.
ATKIES, DAMPSKIBSSELSKABET DONNEBROG et al.
v.
MIKKELSEN et al.
No. 3063.
Circuit Court of Appeals, Fourth Circuit.
February 12, 1931.
*724 Leon T. Seawell, of Norfolk, Va. (Hughes, Little & Seawell, of Norfolk, Va., on the brief), for appellants and cross-appellees.
Jacob Louis Morewitz and Morewitz & Morewitz, all of Newport News, Va., for appellees and cross-appellants.
Before PARKER and NORTHCOTT, Circuit Judges, and COLEMAN, District Judge.
NORTHCOTT, Circuit Judge.
The facts of this case were clearly stated by the judge below in his opinion as follows:
"This is a proceeding by seven foreign seamen against the Danish steamship Sonderborg, claiming wages and penalties, and, as to one of their number, reimbursement for expenses incurred by him in attempting to be cured of syphilis. * * *
"The Sonderborg is a Danish ship. The libelants are foreign seamen, two of whom are from Denmark, one from Holland, one from Germany, one from Sweden, and two from Norway. They were properly signed on board at New Orleans, July, 1929, the articles providing for a voyage, `New Orleans via ports to West Indies and further and return to U. S. A. Final discharging port in U. S. A.' The ship went to the West Indies where she loaded cargo, and thence to Canadian ports, where she discharged. No dispute or misunderstanding of any nature occurred between libelants and the ship up to the time of arrival at Halifax, August, 1929. There, it appears, some doubt arose as to the destination thence of the ship. No orders had been received, and it was believed by the master and by the seamen that she might be sent to some European port. Libelants, or some of them, interviewed the master, but he was as much in the dark as they, and could give no information. They then appealed to the Danish consul with a view to obtaining their discharge at Halifax, or some other Canadian port, and were informed that under the Danish law they were not entitled to demand a discharge, nor a change in the articles, but that their duty was to continue by the ship. The master in turn assured them, or some of them, that if the ship went to Europe, and they were there discharged, their expenses, etc., back to the United States would be paid. This assurance was unsatisfactory for the reason, frankly explained by them, that they were unwilling to be discharged in any European port, since, in that instance, they could not return to the United States except under the quota law, or by getting berths on a vessel on the basis of the European wage standard; whereas, if they returned to the United States on the Sonderborg, they could remain in the United States as seamen, and continue to ship on foreign round-trip voyages on the American pay standard. They thereupon sent protests to the Danish consul general at Montreal, who, in all respects, sustained the position of the local consul, whereupon they returned aboard ship, refused to work, and notified the master that they would not further carry out the articles. The master thereupon had them arrested, and placed in jail, charged with mutiny. The Halifax court dismissed the charge of mutiny, but held libelants on the master's statement that he would charge them with desertion, but before this charge could be formally made, the ship was *725 ordered to return to the United States, and the master having communicated this fact to libelants, all hands agreed to return to the ship, resume work, and this was done, and, on September 9, the ship arrived at Norfolk, where, by reason of failure to have aboard a consular stamped crew list, some negotiations with Washington were necessary before the American immigration officials would permit the men to land; but on the 11th, permission was received, and the men were discharged, and the wages due them, as calculated by the master, delivered to the Danish consul at Newport News for delivery to them when they should demand payment."
As originally brought, the libel claimed damages for false arrest and imprisonment at Halifax, but this claim was dismissed without prejudice prior to the trial.
It is contended on behalf of the appellants that, since this is a controversy with respect to wages between a foreign master and ship on the one hand and foreign seamen on the other, this court should not take jurisdiction. The circumstances under which a federal court will take jurisdiction were discussed in The Roxen (D. C.) 7 F.(2d) 739 [affirmed by this court, Elman v. Moller, 11 F.(2d) 55], where it was held that jurisdiction should always be taken in any case in which the refusal would result in a denial of justice. On this point, as we see it, the judge below in assuming jurisdiction correctly said:
"In this case, as has been pointed out, libelants were signed on in an American port for return, upon the expiration of the voyage, to an American port. They intended and intend to remain in the United States as long as they are undisturbed by the immigration authorities, and this, of course, depends upon their compliance with the acts of Congress with relation to foreign seamen. Not only, therefore, would their contract entitle them to a discharge in the United States, but this in fact occurred. To hold, therefore, that their only remedy was by appeal to the courts of Denmark would be a clear denial of justice."
It appears from the record that, at the time of the signing on of the seamen, certain payments were made by the master of the ship for clothing and board, which, it is contended, was in violation of section 599, title 46 USCA.
With respect to the main question as to whether or not the master was justified in holding out certain sums from the wages of the seamen, at the time of their discharge, we agree with the reasoning of the judge below, who said:
"The motion to decline jurisdiction should again be denied, and this brings me to the crux of the case, namely, whether the action of the master of the ship, at the time of their discharge, in deducting from their wages approximately forty dollars each, to cover expenses incurred by him on account of their refusal to work at Halifax, was permissible. It does not appear quite clearly how this sum, aggregating $280, was spent. Presumably, however, it was in connection with the arrest of the men, and the detention of the ship at Halifax. There is some testimony on behalf of libelants that the master, when the arrangement was made with the seamen to return to the ship, agreed that there would be no deduction on this account. However this may be, there is a total absence of any evidence, or indeed any claim, that the men agreed to reimburse the master on account of this, or any other expense, and it is equally true, though the master claims that he received permission from the consul to omit the same, that no proper record of this charge, either in the aggregate or individually, was entered in the ship's log, or that a hearing was had on account of same, or that any of the libelants, except Nielsen, were apprised of the purpose of the master to deduct this sum from their then earned wages. The refusal to work by libelants at Halifax was, in my opinion, unjustifiable, as was their demand that the articles be there changed so that they might properly leave the ship at the final Canadian port of discharge, for even if it be conceded that the shipping articles were indefinite, this was only in respect to that portion providing, `To West Indies and further.' Conceding that the use of the word `further' was without effect, the articles could not reasonably and fairly have been construed, by either the men or the ship, as meaning anything else than the return to the United States within a reasonable time. In the dispute in Halifax, the men had been aboard only a little more than a month, and it was fully understood by both master and men that the ship was intending to discharge at two other Canadian ports. There was therefore no justification for the refusal of the men to do duty at Halifax. The fact that the vessel was to make two additional stops in Canada, and to discharge cargo at each, afforded opportunity, after the complete discharge of cargo, for the exercise of any rights they had to refuse to go to Europe if orders to the ship to that effect were received. But as it *726 now turns out, there was never any intention to send the ship abroad, and the voyage from an American port to an American port, as originally understood by all concerned, was precisely what occurred. Their action, therefore, in refusing work before the destination of the ship was known, or the final Canadian port of discharge reached, was without justification, and for this, they were subject, of course, to the forfeitures and penalties legally applicable under such circumstances, but no more. The action of the master of the ship in charging them with an arbitrary amount claimed to represent the loss sustained by their conduct in Halifax was, as I view the case, as unjustified as the action of the men in refusing to work, and since there is added to this, his failure to duly notify them and give them a hearing, as required by both the American and the Danish law, it becomes apparent that his action in deducting this, or any sum, from their wages on their discharge at Newport News was unwarranted, and it is equally clear, I think, that for the two days the men were kept aboard after arrival at Hampton Roads, because of the ship's failure to have the proper consular crew list, they were entitled to receive wages, notwithstanding they did no work. It was not their fault that they were not permitted to land. Their contract continued, and their right to pay continued until their final discharge. The action of the master in deducting two days' pay on this account therefore was without authority.
"It will therefore be seen from what has been said above that libelants are entitled to recover their wages according to the terms of their respective contracts, and the delivery of lesser amounts to the Danish consul for their account was wholly ineffective to discharge the obligation of the ship to them. * * * "Libelants say that since the wages due them were not promptly paid, the section of the act (R. S. § 4529) imposing penalties for failure in that regard applies. The provisions of this section are as follows:
"`The master or owner of any vessel * * * shall pay to every seaman his wages * * * in case of vessels making foreign voyages, * * * within twenty-four hours after the cargo has been discharged, or within four days after the seaman has been discharged, whichever first happens; and in all cases the seaman shall be entitled to be paid at the time of his discharge on account of wages a sum equal to one-third part of the balance due him. Every master or owner who refuses or neglects to make payment in the manner hereinbefore mentioned without sufficient cause shall pay to the seaman a sum equal to two days' pay for each and every day during which payment is delayed beyond the respective periods, which sum shall be recoverable as wages in any claim made before the court. * * *' R. S. § 4529; Act March 4, 1915, c. 153, § 3, 38 Stat. 1164 (46 USCA § 596).
"If the provisions of this statute are applicable to the case of foreign seamen on a foreign vessel, it follows, I think, from what I have already said, that the penalty prescribed therein should be imposed. I have frequently had occasion to say that this statute was passed to protect seamen from unjust and unwarranted refusal on the part of the master to pay wages when due, and in all such cases where the facts justified it, I have applied it, but this is the first case in this court, so far as I am now advised, in which it has been sought to extend its provisions to foreign seamen on a foreign vessel, and the statute ought not to be so construed unless it plainly appears that this was the intention of the Congress.
"The section, as it is found in the present text, is in substantially the same language as the original enactment of July 20, 1790, except that by amendment passed December 21, 1898 (30 Stat. 756, § 4), the payment of a sum equal to one day's pay for each day's delay in payment was substituted for the payment of a sum equal to two days' pay for each day, not exceeding ten, during which the payment should be delayed; but by act of March 4, 1915, c. 153, § 3, 38 Stat. 1164, the penalty was changed back to two days' pay for each day of the delay, and it is now insisted by libelants that section 4 of the Act of March 4, 1915 (38 Stat. 1165, as amended by Act June 5, 1920, § 31, 41 Stat. 1006; R. S. § 4530 [46 USCA § 597]) should be read in conjunction with section 3 (R. S. § 4529), and that the proviso found in the latter should be read into the former. Section 4, commonly known as the part-payment statute, makes it the duty of the master, on demand, to pay the seaman one-half part of the wages he shall have then earned at every port where such vessel shall load or deliver cargo before the voyage ends, and the proviso referred to makes the statute apply `to seamen on foreign vessels while in harbors of the United States,' and provides also that the courts of the United States shall be open to such seamen for its enforcement.
"The section has been construed a number of times, and there is no doubt of its validity *727 or its applicability to the case of a foreign seaman on a foreign vessel. Strathearn S. S. Co. v. Dillon, 252 U. S. 348, 40 S. Ct. 350, 351, 64 L. Ed. 607. In the last-named case, it was argued on behalf of the vessel that the purpose of Congress was to limit the benefit of the act to American seamen because the title to the act was `To promote the welfare of American seamen,' but the Supreme Court rejected this contention and refused to limit the benefits conferred to American seamen alone. Mr. Justice Day, who delivered the opinion of the court, in passing upon that question, said `But, taking the provisions of the act as the same are written, we think it plain that it manifests the purpose of Congress to place American and foreign seamen on an equality of right in so far as the privileges of this section are concerned.'
"In the case of The Roxen (D. C.) 7 F.(2d) 739, 740, referring to the abovequoted language, I said: `A careful examination of the opinion of the Supreme Court in the Strathearn Case convinces me that no more is decided there than that Congress has a right to legislate with regard to foreign ships and foreign sailors in American ports, and that, where the intent of Congress is to place foreign seamen and American seamen on a parity, with the same rights and the same obligations, the federal courts may, constitutionally, enforce such legislation. In section 4 of the Seamen's Act, and in one other section, not material to the issues here, Congress has manifested this purpose in distinct and unequivocal language, but otherwise the law remains unchanged, so far as applicable to foreign ships and foreign seamen.'
"Unless, therefore, section 3 of the Act of March 4, 1915 and section 4, as amended (R. S. §§ 4529 and 4530) may be read together as one section, and the proviso in the latter, making its terms applicable to foreign seamen, construed as applying equally in the former, it follows that the court in this case is without authority to include `waiting time,' in the decree for wages. The question is not without serious doubt, and, as involved here, appears never to have been decided, except in the City of Norwich (D. C.) 273 F. 304, which was reversed on another ground. But see on this subject The Tairoa, 297 F. 449-451 (C. C. A. 2d), where, for the purpose of argument, it was affirmatively assumed; and see, also, the Cubadist, 256 F. 203, 205, where Judge Grubb, speaking for the Circuit Court of Appeals for the Fifth Circuit, in a case in which the question for decision was what constituted the voyage, and whether it ended at the port of `final discharge, or at the port of final destination, said: `Section 4529 (section 3 of the Act of March 4, 1915) and section 4530 (section 4 of the Act of 1915) should be construed together. The former provides for the payment of full wages to seamen; the latter, for half then earned wages at any port, touched by the ship, where cargo is received or discharged. * * * During the progress of the voyage, full wages can only be demanded if half then earned wages are wrongfully denied. The section then reads as follows: "And when the voyage is ended every such seaman shall be entitled to the remainder of the wages which shall then be due him, as provided in section 4529 of the Revised Statutes."'
"It is this reference in section 4530 to the provisions of section 4529 that gives weight to the argument that the purpose of Congress was to make the two sections read as one. By section 4530, the seaman, foreign or American, is permitted to demand half his earned wages at every port at which the vessel shall load or deliver cargo before the voyage is ended, and by the same section, to demand all earned wages due him when the voyage is ended, `as provided in the preceding section (4529).' Here the voyage has ended, and the wages are due, and R. S. § 4529 makes it incumbent upon the master or owner either to pay up promptly or suffer a penalty equal to two days' pay for every day during which payment is delayed, `which sum shall be recoverable as wages in any claim made before the court.' To confine the recovery in the case of foreign seamen on foreign vessels to earned contract wages only would be to deny to the wording of the statute its ordinary meaning, for the language of R. S. § 4530, is that foreign seamen, at the end of the voyage, may recover wages, in a suit in a federal court, in the manner provided in R. S. § 4529, and the last-named section by its terms includes the additional amount occurring out of the refusal or delay. There seems to me no escape from the conclusion that the purpose of Congress was to open the federal courts, at least as to these two companion sections, to the suits of foreign seamen equally with American seamen, and to apply the same law, and extend the same benefits to both alike. And if I am correct in so thinking, libelants are entitled to a decree for the amount of wages due them, and to an additional amount for failure of the ship to pay promptly in accordance with the statute. The act provides that this payment, in addition to the amount of the agreed wages, shall begin four days *728 after their discharge, which in this case would be 2 p. m., September 15, 1929. The libel was brought September 16, 1929. Exceptions to the libel were filed October 4, 1929, and the matter was thereafter brought to the attention of the court by counsel for libelants, and the court, having heard the argument of counsel, on November 6th overruled the exceptions. The evidence on behalf of the steamship was taken by deposition, and the case set for trial January 22d on the merits. Five of the libelants, namely, Nielsen, Olsson, Kuntoff, Lubbers, and Sjursen, were then ready with their proof, and submitted their cases. Two of libelants, Mikkelsen and Berentsen, were not then ready, and were not thereafter ready with the proof in their cases until March 27, 1930. The local rule of court provides as follows: `Libels for seamen's wages under section 4529 of the Revised Statutes as amended by the act of March 4, 1915 (ch. 153, § 3), shall have precedence. It shall be the duty of the libelant to call up such a case not later than 10 days after answer or other defence interposed, in default whereof no wages or penalties shall accrue after said 10 days.'
"The answer, as has been shown, was filed January 11, and since the cases of Mikkelsen and Berentsen were not ready within the 10-day period, the rule would apply to them, and the additional payment provided in R. S. § 4529, stopped as of January 20th, inclusive. In the case of the others, it should run to January 22d, inclusive, being the day of the hearing. The delay since then in filing my conclusions was due, in large measure, to personal reasons with which counsel are familiar, and which it is not necessary to set out at length here."
In addition to what was said by the judge below, we are of the opinion that the action of the master was arbitrary, unwarranted, and unjust, and is precisely such conduct as the waiting time statute is intended to strike at. The master admitted that "in order to prevent further trouble" and "in order to bring the ship away from Canada" he intentionally did not notify the seamen of the entries in the logbook charging them with the estimated expense of the delay at Halifax. As pointed out by the judge below, this was in violation of both the American and Danish law. An arbitrary amount was charged against each seaman, and they were purposely left in ignorance of this fact and persuaded, without being apprised of the master's intention to inflict upon them a penalty that would practically deprive them of their entire wages, to return to the ship and to work it back to a port of the United States, where, on leaving the ship, they were offered, as the balance of wages due them for the entire voyage, insignificant sums varying from $1.99 in the case of Sjursen to $8.39 in the case of Olsson. It cannot be doubted that the seamen would not have returned to the ship had they known the true situation, and their return and their services on the return voyage were procured by what amounted to deception. Surely under the Seamen's Act, seamen cannot be treated in this unjust manner by a master without the master incurring the displeasure of the law. Certainly the payment was withheld "without sufficient cause" and was in no "reasonable degree morally justified."
The court below held against the seamen with respect to the payments made for clothing and board at New Orleans, with the exception of one payment of a $20 board bill for one of the seamen. On the question of these advances made in New Orleans, we do not agree with the judge below, but are of the opinion that all the advances made should have been allowed the libelants. The record shows that the clothing was paid for to the shipping master and charged to the men at the time of payment, and the facts do not bring this case within the rule laid down by this court in Swanson v. Torry, 25 F.(2d) 835. In that case the master provided certain articles of clothing for libelants, carried them on board the schooner, and delivered to each man the clothing provided for him, and were charged as advances out of the slop chest. There this court held such action did not constitute an advance within the meaning of section 599, title 46 USCA. Here the circumstances are different. The clothing was provided, paid for, and delivered to the men and charged to the seamen before they sailed, and these sums together with sums paid for board bill unquestionably constituted advances in violation of section 599, title 46 USCA.
While this statute is an unusually stringent one, it was passed to strike at a great evil, and as was said by Judge Morrow in The Eclipse (D. C.) 53 F. 273, 276:
"* * * The payment of advance wages to seamen has been one of the great evils of the merchant marine service. It has been one of the methods employed to defraud the seaman out of a large share of his wages, and, prior to congressional legislation upon the subject, courts of admiralty were continually called upon to interpose their power and authority for the protection of the seamen from *729 this method of imposition. The reports are full of cases declaring in the strongest terms against the many schemes that have been devised to obtain possession of the seamen's wages, even under the form of law."
See, also, The Eudora, 190 U. S. 169, 23 S. Ct. 821, 47 L. Ed. 1002; Sandberg v. McDonald, 248 U. S. 185, 39 S. Ct. 84, 63 L. Ed. 200; Jackson v. The Archimedes, 275 U. S. 463, 48 S. Ct. 164, 72 L. Ed. 374; and Neilson v. Rhine Shipping Co., 248 U. S. 206, 39 S. Ct. 89, 63 L. Ed. 208.
Unlawful advances made in violation of the statute have been held under section 578, title 46 USCA, to render a contract for service, made by the shipping articles, void, and to give the seamen the right to leave the service at any time. Kenney v. Blake (C. C. A.) 125 F. 672; The Alnwick (D. C.) 132 F. 117.
This holding, which we do not think it necessary for the purposes of this case to discuss, would, if applied, fully justify the seamen in their action at Halifax.
The judge below properly limited the waiting time allowed the seamen, as it would have been manifestly unjust to the appellant to have charged them with the time which was running while the judge was considering the case, which time was prolonged because of circumstances known to have been entirely justified. This court has repeatedly discussed the principles governing the application of the waiting time statute, citations of the cases and the last discussion being found in The Lake Gaither, 40 F.(2d) 31. The Supreme Court in Collie v. Fergusson, 281 U. S. 52, 50 S. Ct. 189, 74 L. Ed. 696, in an able discussion of this question, has laid down the rule to be followed. The judge below properly applied the rule.
With respect to the claim of libelant, Nielsen, for maintenance and cure, the judge below said:
"The claim of Nielsen for $75 for medical expenses in being treated for syphilis is denied. Whatever may be the liability of the ship to the government for failure to declare him afflicted with this loathsome disease, he is himself equally guilty for failure to declare the fact himself. The statute (USCA, title 8, § 170) is for the protection of the public. He ought not to be permitted to flout it and claim under its terms at the same moment."
In addition to this the record shows that Nielsen made no demand upon the captain for hospitalization at the time of his discharge, and that in a talk with an employee of the Danish Vice Consul, he stated that he was being treated by the Public Health Service and that it would not cost him anything. The action of the court below in denying this claim was correct.
The decree of the court below will be so modified as to increase the amounts allowed the seamen by the sums paid out for clothing and for board at New Orleans, and in all other respects the decree will be affirmed.
Modified.
WILLIAM C. COLEMAN, District Judge (dissenting).
I regret that I cannot concur with the majority of the court in affirming the finding of the trial court that the appellants are liable for penalties under Rev. St. § 4529, (46 USCA § 596).
I agree with the majority of the court that the trial judge did not err in assuming jurisdiction, and in not referring the appellees to the Danish Consul at Norfolk or Newport News for a determination of their rights. Although all of these parties are foreign seamen, engaged in service upon a Danish vessel, and although the questions involved touch merely matters of discipline aboard that vessel and do not involve the peace and dignity of this country  matters which, generally speaking, may properly be left for settlement by the authorities of the nation to which the vessel belongs  the particular circumstances of the present case clearly justify a different disposition of it. It is quite true that the shipping articles provided that the seamen were to be subject to "Danish sea law" and were countersigned and stamped by the Danish Consul when the men signed on at New Orleans. It is equally true that there is no reason why seamen should not be held to the terms of their contracts just as other persons, if, as here, there is no evidence of mistake, fraud, or improper inducement. And this is true even though the given contract, when enforced by our admiralty courts, contemplates that such courts shall apply the law of the foreign country which the parties have written into their agreement. But these shipping articles do not present so simple a question, because if we assume that by the phrase "Danish sea law" the seamen intended that they should be governed, as asserted by appellants, exclusively by article 43 of the Seamen's Act of Denmark, which provides that in any dispute over wages the decision made by the first available Consul before whom the matter shall be laid shall be binding until it can be brought before a court in the Kingdom of Denmark, the admiralty *730 court would thereby be ousted in toto of its jurisdiction, and the law appears to be clear that whether such should take place is a matter resting in the sound discretion of the trial judge. If he elects to assume jurisdiction, such election should not be disturbed in the absence of a showing that it was based upon wrong principles or, in other words, unless the rights of the parties are not thereby best promoted. The Belgenland, 114 U. S. 335, 5 S. Ct. 860, 29 L. Ed. 152; Elman v. Moller (C. C. A.) 11 F.(2d) 55; Heredia v. Davies (C. C. A.) 12 F.(2d) 500.
Here, to relegate the seamen to a determination of their rights in the first instance by the local Consul was not only what their agreement presumably called for, but as will hereinafter be noted more particularly, it is what they actually relied upon, at least to a large extent, in the controversy which ensued with the master of the vessel. But to say that they must abide by the Danish law to its full extent, without recourse to our admiralty courts, and thereby be subjected to the possibility if not the probability of indefinite delay until their rights might be finally determined in Denmark where presumably they would be required to appear in person, during all of which time the payment of their wages would be suspended, would clearly work an injustice, especially since the reference to the Danish law in the contract is not specific but general. For these reasons, therefore, the trial court was correct in assuming jurisdiction.
I also agree with the majority of the court, and with the trial judge, that the correct interpretation of the penalty provisions of Rev. St. § 4529 is that they are, in proper cases, applicable to seamen on foreign vessels while in harbors of the United States as well as to those on American vessels, because that section and Rev. St. § 4530 (46 USCA § 597) are to be read together, it being the evident purpose of Congress in enacting them to place domestic and foreign seamen on a parity. But I cannot reconcile the imposition of penalties in the present case with the construction which the Supreme Court, and this court, have placed upon Rev. St. § 4529, nor with the principle, which I believe to be self-evident, that it was never the intention of Congress in passing this statute that the admiralty courts should substitute their discretion for that of masters of vessels, where such discretion has been exercised in the performance of their duties, through an honest, reasonable belief that it was warranted, although as a matter of fact, such belief was erroneous.
Section 4529 requires payment of a seaman's wages within two days after the termination of the agreement under which he has shipped or at such time as he is discharged, whichever first happens. Neglect to make such payment "without sufficient cause" imposes a penalty equal to the sum of two days' pay for each and every day during which payment is delayed beyond the respective period, and this sum shall be recoverable as wages. The phrase "without sufficient cause" has received a wealth of interpretation. The Supreme Court in the most recent case, Collie v. Fergusson, 281 U. S. 52, pages 55, 56, 50 S. Ct. 189, 191, 74 L. Ed. 696, said:
"The phrase `without sufficient cause' must be taken to embrace something more than valid defenses to the claim for wages. Otherwise, it would have added nothing to the statute. In determining what other causes are sufficient, the phrase is to be interpreted in the light of the evident purpose of the section to secure prompt payment of seamen's wages (H. R. Rep. 1657, Committee on the Merchant Marine and Fisheries, 55th Cong., 2d Sess.), and thus to protect them from the harsh consequences of arbitrary and unscrupulous action of their employers, to which, as a class, they are peculiarly exposed.
"The words `refuses or neglect to make payment * * * without sufficient cause' connote, either conduct which is in some sense arbitrary or willful, or at least a failure not attributable to impossibility of payment. We think the use of this language indicates a purpose to protect seamen from delayed payments of wages by the imposition of a liability which is not exclusively compensatory, but designed to prevent, by its coercive effect, arbitrary refusals to pay wages, and to induce prompt payment when payment is possible. Hence we conclude that the liability is not imposed regardless of the fault of the master or owner, or his retention of any interest in the vessel from which payment could be made. * * *
"That the liability is not incurred where the refusal to pay is in some reasonable degree morally justified, or where the demand for wages cannot be satisfied either by the owner or his interest in the ship, has been the conclusion reached with practical unanimity by the lower federal courts."
This court in one of its latest decisions on this point, The Velma L. Hamlin, 40 F.(2d) 852, quoted most of the aforegoing. After referring to the earlier decision of the Supreme Court in Pacific Mail S. S. Co. v. Schmidt, 241 U. S. 245, 36 S. Ct. 581, 60 L. *731 Ed. 982; to an earlier decision of its own, Mystic S. S. Co. v. Stromland 21 F.(2d) 607; and to a decision of the Court of Appeals for the Second Circuit, The Thomas Tracy, 24 F.(2d) 372, said [page 854, 855 of 40 F.(2d)]:
"And we agree with the following statement of the rule by Judge Ervin in The Cubadist (D. C.) 252 F. 658, 662:
"`I do not think that the statute was intended to penalize any master or vessel for exercising sound judgment and discretion, or to require them to surrender such judgment under a penalty of double pay. I think the language used carries with it the idea that, where the court finds that the master's refusal was willful and without justification or excuse, double pay should be given, but where the master was exercising a reasonable and proper discretion, and the question was doubtful, it reserves to the court the power to pass upon the question of the reasonableness or the sufficiency of the excuse of the master, and give or deny the double pay, accordingly as the court may find the contention of the master to be honest or a mere pretext.'"
See also The Corapeak, 46 F.(2d) 262, and M. Vidal v. American Scantic Lines, 47 F.(2d) 605, decided by this court during the present term.
If the refusal of the master in the present case to pay without the deductions complained of was not "in some reasonable degree morally justified" by the unusual, critical situation, in no sense of his own creation, in which he found himself both in the harbors of Halifax and Newport News, if he did not at those places exercise "a reasonable and proper discretion," in adopting the disciplinary measures that he did adopt, and if on the whole the question was not a "doubtful" one as to just how it should be solved, I am at a loss to know what elements are necessary to constitute moral justification or the exercise of reasonable and proper discretion within the meaning of this act.
In an extremely well-considered opinion in The Thomas Tracy, supra, in which certiorari was denied (277 U. S. 599, 48 S. Ct. 530, 72 L. Ed. 1005), it was held that where a master refused to pay seamen their wages under an honest misconstruction of the meaning of terms in shipping articles, the penalties under section 4529 were not recoverable. There the doubt arose, from an ambiguity in the language employed, as to whether one or more than one voyage was intended  a situation very similar to the present one. The court said [page 374 of 24 F.(2d)]:
"The statute does not mean that the refusal to pay wages must be based upon a legal defense to the wages. It means that, although it may ultimately be determined that there is no actual legal defense to the claim for wages, nevertheless, if the owner or master had sufficient cause to withhold the wages, when demanded, beyond the time mentioned in the statute, it relieves the vessel of the imposition of the penalties.
"Accepting the facts found below, of an honest misconstruction of the meaning of the terms thereof, there was sufficient cause to withhold it. O'Hara v. Luckenbach (C. C. A.) 16 F.(2d) 681; The Trader (D. C.) 17 F.(2d) 623. The master was honest in his belief that the appellees were deserters in refusing to put to sea as the ship prepared after the cargo was discharged, and the conduct of the appellees, as he testified, reasonably led him to believe that they would do so. Errors of judgment, made honestly, such as this, should not penalize the ship, as it would here, if this decree were affirmed."
Similarly, in The St. Paul (D. C.) 133 F. 1002, where a seaman was fined a portion of his wages for disobedience of orders but the master failed to make an entry of the offense in the ship's log when committed, as required by section 4597 (46 USCA § 702), it was held that although the imposition of the fine was unavailable as a defense in an action for wages, the shipowner was nevertheless justified in contesting his liability, and was, therefore, not liable to imposition of penalties under Rev. St. § 4529, but merely for the amount of the wages withheld. This decision was cited with approval by this court in The Velma L. Hamlin, supra.
I am unable to distinguish the conduct of the masters in the aforegoing cases from that of the master in the present case when tested by the rule of "sufficient cause" as there laid down. I admit that the phrase contemplates something more than good faith; that in addition to honesty, there must exist reasonable ground for withholding part of the wages. In the present case, with respect to the episode at Halifax, upon learning of the possibility of the vessel being ordered to a European port, the men refused to perform their duties because under their construction of the shipping articles service on such a voyage was not required of them. The Consul to whom they appealed at Halifax, such appeal presumably being contemplated by the terms of the shipping articles, disagreed with them. *732 They then requested that the Consul General at Montreal be communicated with, which was done, and their claim being again overruled, they refused to work, whereupon the master had the men arrested on the charge of mutiny, but not until after further consultation with the Consul and not until he had made further effort to induce them to return to work. After a hearing before the local authorities, the charge of desertion being substituted for that of mutiny, but before any disposition was made of their case, the master received orders to return to Hampton Roads, whereupon the men readily agreed to return to the ship and resume their duties. It is significant that in the original proceedings a claim was made by them for alleged false imprisonment at Halifax but was dismissed. As a result of this episode at Halifax the master incurred, by way of expenses and lost time, the sum of $280. This amount he apportioned among the seven claimants and deducted the share from the wages of each. This is covered by a proper entry in the ship's log which also contains a statement of the reason why a further hearing was not given the men at Halifax, as follows: "The examination is put off according to the Maritime Law S 63 and 64 on the advice of the Danish Consul to avoid further trouble during the voyage and at Port Alfred, where there is no Consul, until ship arrives in U. S. A., where discharge is to take place in the Danish Consulate." The trial judge therefore appears to have been in error when he said "that no proper record of this charge, either in the aggregate or individually, was entered in the ship's log." He found that there was no justification for the seaman's conduct at Halifax and that therefore they were subject "to the forfeitures and penalties legally applicable under such circumstances, but no more." The trial judge added: "The action of the master of the ship in charging them with an arbitrary amount claimed to represent the loss sustained by their conduct in Halifax was, as I view the case, as unjustified as the action of the men in refusing to work, and since there is added to this his failure to duly notify them and give them a hearing as required by both the American and the Danish law, it becomes apparent that his action in deducting this or any sum from their wages on their discharge at Newport News was unwarranted." The penalties referred to as being "legally applicable" (46 USCA § 701) are admittedly less than the sums which were deducted in the present case, but since the assessment of these penalties was in conformity with the recommendation of the Consul, as was also the postponement of the hearing, it must follow that such action was not unwarranted in the sense that it was done willfully or arbitrarily, as the trial court decided, but rather through an error of judgment, honestly and reasonably exercised.
Similarly, with respect to the failure to pay the wages for the two days while the vessel was detained by the immigration authorities at Newport News, due to the fact that the vessel's crew list had not been stamped by the American Consul at the last Canadian port, the master's conduct was in some "reasonable degree morally justified." It was not his fault that there was no American official to certify his crew at Port Alfred, and he acted with reasonable diligence upon being notified by the authorities at Hampton Roads that his papers were defective. During the vessel's detention the men were taken care of without expense to themselves and no services were required of them. Here the master, again relying upon the Danish law, which he thought controlled, was mistaken as to his right to withhold the wages, which continued until finally discharged, but because such withholding was due to an honest, although a mistaken, belief as to his justification for so doing, I cannot bring myself to admit that the statute intended the shipowner should be required to do more than remit the amount of the wages thus erroneously withheld. It is true that he did not actually tender the balances believed to be due to the men aboard the ship, but paid them to the Danish Consul at Newport News. He did this, however, because the vessel's chief engineer, who was the officer in charge of the seamen, had told the master that they would not accept any payment if tendered. Clearly under such circumstances the master was not required to do an act known to be futile. Furthermore, the seamen had already sued out an attachment for their wages in the state court and had served the master with process. It is also significant to note that the remainder of the vessel's crew who had been detained in the same manner and offered the same wages have not, so far as the record discloses, protested. The trial judge found that the action of the master was "without authority."
It is to be noted that the statute does not use either the word "unwarranted" or the phrase "without authority." It will be admitted that what the master did both at Halifax and at Newport News was unwarranted or without authority  taking these terms to be synonymous  if what is meant is that the *733 statute did not permit the master to do what he did. But this is only a part of the test. The real question is whether the forbidden conduct was with or without reasonable justification under the circumstances. The trial judge himself admitted that the action of the seamen at Halifax was without justification and I find no evidence of arbitrary conduct on the part of the master in either case. He had behind him the experience of thirty-eight years at sea. A court cannot visualize the exigencies which constantly arise upon a vessel and which require both prompt and firm action. Although there is some testimony on the part of the seamen that the master drank heavily, and that this affected his judgment, I find no support for this conclusion; nor apparently did the trial judge because the master's conduct in this respect is not alluded to.
The statute is admittedly a harsh one, and whether or not it should be invoked is, of course, not to be determined by the amount of the penalties. But the shipowner, as well as the seamen, has rights which must be protected, and the very fact that the act is oppressive demands a very careful scrutiny of the facts in each case. The total amount of the wages withheld from the seven seamen, and to which I agree they are entitled, is approximately $400, whereas the penalties allowed by the lower court aggregate approximately $3,600  a sum nine times as great. It seems unconscionable to interpret the statute as saying, or that its framers ever intended, that such virtual confiscation should be practiced under it in a case like the present one, where the master has throughout merely endeavored to discipline members of his crew, and to conform to the immigration laws in a matter dictated by his own honest and reasonable, although erroneous convictions.
I am not unmindful of the principle repeatedly reaffirmed by this court, that there is a strong presumption of the correctness of the findings of a trial judge in admiralty, upon questions of fact, where he has heard the witnesses. But here, the situation is somewhat different. The interpretation of a federal statute is involved, and I cannot bring myself to the view of the trial judge that the facts bring the case within the penalty provisions of the statute.
With respect to the amounts deducted from wages to cover the cost of clothing supplied to the seamen at the inception of the voyage, I also find myself in disagreement with the majority of the court, and therefore in accord with the trial judge who found that such was not in violation of the statute forbidding the advance of wages (46 USCA § 599), although advances made for board and lodging were contrary to the statute. It appears that when the men came aboard at New Orleans, they were badly in need of clothing, and since the ship neither had, nor was it apparently required to have, a slop chest (see 46 USCA § 670), and since they requested this clothing, the master directed the Shipping Master to supply it to the men, he paid the Shipping Master  just when is not entirely clear from the record  and the men were charged accordingly out of their wages as they fell due.
In Swanson v. Torry, 25 F.(2d) 835, this court recently decided that the statute was not violated where the master provided the seamen with various indispensable articles of clothing not found in the slop chest, and deducted the cost of same from their wages. I fail to find any legal distinction between the two situations. If the master may himself purchase necessary clothing for his crew, I see no reason why he may not do the same thing vicariously. The transaction partakes no more of an advance or allotment in the one case than in the other. In view of this conclusion, it becomes unnecessary to do more than allude to the suggestion that if these were unlawful advances, then, by virtue of Rev. St. § 4523 (46 USCA § 578), the contract for service in the present case was rendered void and the seamen had the right to leave the service at any time. An advance payment of wages in violation of this section does not render the contract for service made by the shipping articles void, unless it appears that such advance formed part of the consideration or inducement for entering into the contract  a fact which does not appear in the present case. The Bound Brook (D. C.) 146 F. 160.
With respect to the claim of libelant Nielsen for maintenance and cure, I agree that it is without merit and was therefore properly denied.