NEILSON ET AL. v. RHINE SHIPPING COMPANY, CLAIMANT OF THE SAILING SHIP "RHINE."

HARDY ET AL. v. SHEPARD & MORSE LUMBER COMPANY, CLAIMANT OF THE BARKENTINE "WINDRUSH."

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

Nos. 393, 394. Argued November 5, 1918.—Decided December 23, 1918.

Section 11 of the Seaman's Act of 1915, c. 153, 38 Stat. 1164, construed as not prohibiting advance payment of wages when made by an American vessel to secure seamen in a foreign port   P. 212. *Sandberg* v. *McDonald, ante,* 185.
250 Fed. Rep. 180, affirmed.

The cases are stated in the opinion.

Mr. *Silas B. Axtell*, with whom Mr. *Vernon S. Jones* was on the brief, for petitioners:

A contract cannot be given legal effect in a court of the United States which is contrary to the declared public policy of the United States; and this rule is not affected by the fact that the objectionable parts of the contracts have been executed and that those remaining are innocuous. *Hope* v. *Hope*, 8 DeG. M. & G. 731; *The Kensington*, 183 U. S. 263.

The policy of a State is evidenced by its constitution and laws. It is also obvious that no State will give effect to the laws of another on the principles of comity when the effect would be injurious to the State or its citizens. *Woodward* v. *Roane*, 23 Arkansas, 523; *Marshall* v. *Sherman*, 148 N. Y. 9; *Hill* v. *Spear*, 50 N. H. 253, 262.

This practice of "crimping" is vile and pernicious, destructive of a free and clean class of seamen. It involves greater moral turpitude than gambling. See *Patterson* v. *Bark Eudora*, 190 U. S. 169.

The contract was one looking to a performance partly on board an American vessel while on the high seas and partly within the territorial jurisdiction of the United States; the law of the place of performance governs.

Congress intended the act to apply to all advances made in foreign ports where the satisfaction of the advance note might be made in the United States. The penal provisions of a statute do not necessarily make it penal in its whole intent or for all purposes. *Hyde* v. *Cogan*, 2 Doug. 699; *Short* v. *Hubbard*, 2 Bing. 349. Also a statute which is made for the good of the public, though it is penal, ought to receive an equitable and liberal construction. *Tyner* v. *United States*, 23 App. D. C. 324.

In affording relief in a civil suit under a statute, both remedial and penal, the court will not be bound by any

narrow technical or forced interpretation by which it might have been bound were the statute alone penal. *Northern Securities Co.* v. *United States*, 193 U. S. 197; *United States* v. *Twenty-five Packages of Panama Hats*, 231 U. S. 358.

A statute should also be read with reference to its leading idea, and its predominant purpose will prevail over the literal import of particular terms.

Even a cursory review of the various sections of this act reveals in Congress a zealous regard for the uplift, protection and emancipation of American seamen. The legislation against "crimping" is but one of the many reforms, sought by this and earlier laws which throw light on the meaning of this one.

If the act be regarded as strictly penal, Congress, under the commerce clause, has ample authority to punish for extra-territorial offenses. *United States* v. *Craig*, 28 Fed. Rep. 795, 801; *United States* v. *Gordon*, 5 Blatchf. 18. See *The Belgenland*, 114 U. S. 355; *The Brantford City*, 29 Fed. Rep. 373.

A comparison of the Dingley Act, of which the section in question was an amendment, reveals that the words now found in subsection (e) of the present act, "while in waters of the United States," were not in the original Dingley Act. It is a fair inference that Congress intended the new act to apply universally to American vessels. See dissenting opinion in court below, 250 Fed. Rep. 184.

*Mr. Roscoe H. Hupper* for respondents:

Under the Act of 1884 advances to seamen on shipment on an American vessel in a foreign country were not unlawful. *The State of Maine*, 22 Fed. Rep. 734; *Patterson* v. *Bark Eudora*, 190 U. S. 169.

The amendment of 1915 did not change the law with respect to advances in foreign ports, and some of the

changes made indicate more clearly than did the Act of 1884 that it was not intended to prohibit advances in foreign ports. The only language in the 1915 section which bears directly on locality of application is subdivision (e). The 1884 section provided: "This section shall apply as well to foreign vessels as to vessels of the United States."

The insertion in the 1915 section of the words "while in waters of the United States." clearly got its impetus from *Patterson* v. *Bark Eudora, supra,* which held that a British vessel while in waters of the United States was subject to the prohibition against advances. The purpose of this insertion was to make it plain to foreign shipowners, particularly in view of the abrogation of treaties provided for by the Act of 1915, that while their vessels were in our ports, our statute against advances would be applied to them. See *The Ixion,* 237 Fed. Rep. 142; *The London,* 238 Fed. Rep. 645; affd. 241 Fed. Rep. 863. This did not reflect an intention that as to American vessels the prohibition against advances should apply in foreign countries.

If it be assumed that Congress could have intended by this provision to make the prohibition apply to advances in foreign countries, we find it hard to imagine any more indirect or ambiguous method of effecting this result. The congressional debates and reports do not disclose that Congress was acquainted with or had in mind advances made in foreign countries. Nor, so far as we have been able to find, do they make any reference to Judge Brown's decision in *The State of Maine, supra,* or to the conditions which gave rise to that case and this. It was common knowledge, however, that foreign seaman's laws differed from our own and in many instances permitted advances, and undoubtedly for that reason it was deemed prudent (and only courteous to foreign nations in view of the proposed abrogation of treaties with respect to

seamen on foreign ships) to insert in the section a specific declaration of the time, *i. e.*, while they should be in United States waters, that foreign ships would be subject to this section.

The very fact that our law applies to foreign vessels while in our ports is one of the strongest arguments why it should be held not to apply to our vessels while in foreign ports. In other words, we should recognize the law of foreign countries with respect to our vessels in their ports, just as we expect foreign countries to recognize our law with respect to their vessels in our ports. This but accords with the general doctrine that when a merchant vessel of one country enters a port of another for the purposes of trade it subjects itself to the law of the place to which it goes. *Wildenhus's Case*, 120 U. S. 1, 11. The contracts between the ship and the seamen as well as the advances were made on shore at Buenos Ayres. "The general and almost universal rule is that the character of the acts as lawful or unlawful must be determined wholly by the law of the country where the act is done." *American Banana Co.* v. *United Fruit Co.*, 213 U. S. 347, 356.

Questions concerning performance are governed by the law of the place of performance, but questions concerning the making and validity of the contract are governed by the law of the place where the contract is made. *Scudder* v. *Union National Bank*, 91 U. S. 406.

The penal provisions of the section show that it was not intended to apply to American vessels in foreign countries.

The title of the Act of 1915 indicates no different purpose from that of the Act of 1884, and the provision with respect to advance payments not being a defense is unchanged.

The 1884 section when amended and reënacted in 1915 carried with it into the 1915 section the interpretation

which had been given it by the courts and the executive department of the government.

Advances made to seamen in foreign countries are not against the public policy of the United States, and cannot be nullified on that ground.

*Mr. Assistant Attorney General Brown,* with whom *Mr. Robert Szold* was on the brief, for the United States as *amicus curiæ:*

Section 11 requires that in a libel for wages against an American vessel advances paid by the American master abroad shall not be treated as valid. It is submitted that the rule of prior executive and judicial construction is not applicable for various reasons.

The rule is not arbitrary. It affords a presumption operative in absence of countervailing evidence, but is of no avail where the true legislative intent otherwise is manifest. "It is not allowable to interpret what has no need of interpretation." *United States* v. *Graham,* 110 U. S. 219, 221.

In the present case the environment in which the act was passed and the legislative history demonstrate the intent to cover all foreign-made advances by vessels, foreign and domestic, coming into our ports. The prime purpose to aid the merchant marine is otherwise defeated.

The Act of 1915, moreover, amended the statute which had previously been construed, by words designed to do away with any previous misconception.

It added the words "while in waters of the United States" to qualify the words "foreign vessels." Thus, the validity of the advance by foreigners abroad was not sought to be affected, but only its recognition and enforcement in libels for wages in our courts against foreign boats which come into our waters. By omitting the qualifying words with reference to "vessels of the United States," the actual validity of the advance made abroad

by American masters was, however, touched.   The decision in *The State of Maine*, 22 Fed. Rep. 734, disregards the settled principle that the law governing the shipment of seamen abroad is the law of the flag, and it disregards also the requirements of Rev. Stats., § 4517.   And a custom of an executive department, however long continued, must yield to the positive language of a statute. *Houghton* v. *Payne*, 194 U. S. 88, 100.

Congress may impose in its discretion conditions upon the entry into American ports of American vessels as well as of foreign vessels.   The citizen has no more vested right to engage in foreign trade without regard to legislative conditions, than the foreigner. *Buttfield* v. *Stranahan*, 192 U. S. 470; *Weber* v. *Freed*, 239 U. S. 325.   The courts, moreover, may apply the national law to determine the validity of contracts made abroad between seaman and master on national vessels.   *The Belgenland*, 114 U. S. 355, 364; Hall, International Law, 6th ed., p. 199; *United States* v. *Rodgers*, 150 U. S. 249.

The statutes of the United States have regulated the payment of wages by American vessels to American seamen in foreign ports from the beginning.

MR. JUSTICE DAY delivered the opinion of the court.

These cases were considered together in the courts below and may be disposed of in like manner here.

The facts are:

In the first case Paul Neilson and nine other seamen sue for the recovery of wages claimed to be due them from the bark "Rhine."   It appears that they shipped on the American bark "Rhine" at Buenos Ayres, October 7, 1916, for a voyage to New York, at the rate of $25 per month.   It is stipulated that the shipping of seamen on sailing vessels at Buenos Ayres is controlled by certain shipping masters, to one of whom the libelants, in ac-

cordance with the usual custom and as a means of securing employment, signed a receipt or advance note for one month's wages. These advance notes were presented to the American Vice-Consul at Buenos Ayres before the libelants signed the articles, were by him noted on the articles and, in the presence of the libelants, directed to be paid on account of the wages of the respective libelants. It was further stipulated that in directing the master of the "Rhine" to honor such advance notes, the Consul was acting in accordance with § 237 of the Consular Regulations of the United States. When the bark arrived at New York the libelants were paid the wages earned, less the $25 advanced. They now seek to recover the sum thus deducted, by virtue of the terms of § 11 of the Act of March 4, 1915, entitled "An Act To promote the welfare of American seamen in the merchant marine of the United States," upon the theory that such advances are unlawful and of no effect.

The facts in relation to the case of the Barkentine "Windrush" differ from the above only in respect of the fact that the advance notes are not in evidence, but are noted on the articles.

The District Court decided in favor of the libelants. 244 Fed. Rep. 833. The Circuit Court of Appeals reversed the decrees. 250 Fed. Rep. 180. The cases are here on writs of certiorari.

The section of the statute is the same as that involved in the case of The Talus [Sandberg v. McDonald], No. 392, ante, 185. The difference is that the advances were made by the master of an American vessel in a South American port, whereas in The Talus the advancements were made to foreign seamen in a British port. The same general considerations as to the interpretation of the statute which controlled in the decision of the case of The Talus are applicable here and need not be repeated.

That American vessels might be controlled by con-

205   McKENNA, HOLMES, BRANDEIS, and CLARKE, JJ., dissenting.

gressional legislation as to contracts made in foreign ports may, for present purposes at least, be conceded. It appears that only by compliance with the local custom of obtaining seamen through agents can American vessels obtain seamen in South American ports. This is greatly to be deplored, and the custom is one which works much hardship to a worthy class. But we are unable to discover that in passing this statute Congress intended to place American shipping at the great disadvantage of this inability to obtain seamen when compared with the vessels of other nations which are manned by complying with local usage.

The statute itself denies clearance papers to vessels violating its terms. This provision could only apply to domestic ports and is another evidence of the intent of Congress to legislate as to advances made in our own ports.

*Affirmed.*

MR. JUSTICE McKENNA, with whom concur MR. JUSTICE HOLMES, MR. JUSTICE BRANDEIS and MR. JUSTICE CLARKE, dissenting.

These cases were submitted with Nos. 361 [*Dillon* v. *Strathearn S. S. Co.,* ante, 182,] and 392, [*Sandberg* v. *McDonald,* ante, 185,] and, like them, are proceedings in admiralty under the Seamen's Act of 1915, 38 Stat. 1164–1168.

The facts are set out in the opinion of the court. In these cases, as in others, we are constrained to dissent. The principle of decision should be, we think, that declared in our dissent in *The Talus,* ante, 185. The facts of these cases put more tension upon it, that is, an adhesion to the words of the statute as determinative of its purpose rather than some of its consequences. We have here the somewhat appealing force of a picture

of an American ship only able to escape practical internment in a foreign port by a violation of the law, if it be as we have declared it. And this under the sanction of the United States Consul acting under the following regulation of the Department of State:

"237. Advances to Seamen Shipped in Foreign Ports.— The shipment of seamen in foreign ports cannot be considered as within the intention, and hence not within the proper construction, of the Act referred to in the next preceding paragraph [inserted in the margin].[1] The final clause of the Act, which declares that this section shall apply as well to foreign vessels as to those of the United States, and that in case of violation a clearance shall be refused them, is a clear indication that Congress did not in this section refer to the shipment of seamen in foreign ports, but had in view acts done in the United States alone. The provision of the statute as to payment of advance wages is not intended to apply to seamen shipped in foreign ports. In the settlement of wages due seamen in such cases, therefore, consular officers will take into account what has been paid in advance. 22 Fed. Rep. 734."

---

[1] "236. No Advance Wages.—Except in case of whaling vessels, it is not lawful to pay any seaman wages before leaving the port at which such seaman may be engaged in advance of the time when he has actually earned the same, or to pay such advance wages to any other person, or to pay to any one except an officer authorized by Act of Congress to collect fees for such service, any remuneration for the shipment of a seaman. If any such advance wages or remuneration shall have been paid or contracted for, the Consul, in making up the account of wages due the seaman upon his discharge, will disregard such advance payment or agreement and award to the seaman the amount to which he would be entitled if no such payment or agreement had been made. Nor should Consuls permit the statute to be evaded indirectly, as by part payment in advance and then stating rate of wages too small. R. S., §§ 4532, 4533; 23 Stat. L. 55, § 10; 24 Id. 80, § 3; 27 Fed. Rep. 764."

We are unable to assent. We regard the act of Congress as clear and that the theatre of its injunction is the harbors of the United States. It is misleading to dwell upon the jurisdiction of other places, which is but another name for control. The jurisdiction, control, is in and by the United States and the command is that advances shall not be deducted from wages of seamen on vessels, American or foreign, while in the waters of the United States. Where they were made or under what circumstances made are not factors in judgment. They are the mere accidents of the situation and if they reach the importance and have the embarrassment depicted by counsel, the appeal must be to Congress, which no doubt will promptly correct the improvidence, if it be such, of its legislation. We have already expressed our view of the control of the language of the law and that it is a barrier against alarms and fault-finding.

It hence follows that we are of opinion the judgment of the Circuit Court of Appeals in each case should be reversed and that of the District Court affirmed.