## THE VESTRIS.

### Petition of LIVERPOOL, BRAZIL & RIVER PLATE STEAM NAV. CO., Limited, et al.

District Court, S. D. New York.
Sept. 15, 1931.

See, also (D. C.) 49 F.(2d) 947.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (by Van Vechten Veeder, Chauncey I. Clark, Paul Fearson Shortridge, and Stanley R. Wright, all of New York City), for petitioner.

Bigham, Englar, Jones & Houston, of New York City (by D. Roger Englar, Oscar R. Houston, W. J. Nunnally, Jr., and Francis B. Reed, all of New York City), for 27 death claims, 8 personal injury claims, 13 baggage claims, and 550 cargo claims.

Hunt, Hill & Betts, of New York City (by George Whitefield Betts, Jr., George C. Sprague, and Joseph A. McDonald, all of New York City), for Frederick F. Brown, and others.

George Z. Medalie, U. S. Atty., of New York City (by Charles E. Wythe, of New York City).

Haight, Smith, Griffin & Deming, of New York City (by Arnold W. Knauth, of New York City), for Elvira F. Rua, as adm'x of Jose Gonsalves Rua, and others.

Kirlin, Campnell, Hickox, Keating & Mc-Grann, of New York City (by Charles R. Hickox and Clement C. Rinehart, both of New York City), for West India Oil Co., H. C. Johnson, and E. Lever.

Carter, Ledyard & Milburn, of New York City (by Rush Taggart, of New York City), for C. D. Andrews & Co., and certain other cargo claimants.

Rumsey & Morgan, of New York City (by Mark W. Maclay and Ralph W. Brown, both of New York City), for Marion C. Batten, individually and as adm'x of Norman Kirkpatrick Batten.

Choate, Larocque & Mitchell, of New York City, for Mary L. Stone, as adm'x of Charles I. W. Stone.

Lord, Day & Lord, of New York City (by F. J. Clark, of New York City), for Herman Hipp.

Nathan Burkan, of New York City (by Herman Finkelstein, of New York City), for claimant Anne De Vote.

Wise, Shepard & Houghton, of New York City (by Arnold W. Knauth, of New York City), for Otto Willi Ulrich and wife.

Edward J. Leon, of New York City (by Sidney M. Offer, of New York City), for Michael Coriarty.

Kiddle, Margeson & Hornidge, of New York City, for G. H. Halpert.

L. V. Axtell, of New York City, for claimant.

GODDARD, District Judge.

Petition for limitation of liability. Many witnesses have been called in this proceeding and extensive testimony has been presented by experts and others in behalf of the many parties interested, and their proctors have submitted briefs discussing certain questions of law which the court is requested to pass upon preliminary to the preparation and submission of the principal briefs. The questions are

1. Did the British statutory provisions in respect to the load line apply to the voyage of the Vestris from New York to South America?

I find that they did not apply.

2. Are actions brought under section 4 of the statute entitled Death on the High Seas by Wrongful Act of March 30, 1920 (46 USCA sects. 761–768) subject to limitation of liability?

They are not, as I construe this section.

3. Are all the death claims barred upon which action is not commenced within twelve calendar months after death?

My conclusion is that they are.

The following statement includes the facts necessary for the consideration of these law questions:

The Vestris, a vessel of some 10,000 tons gross tonnage, was built in Liverpool, England, in 1912. She was owned by the petitioners, Liverpool, Brazil & River Plate Navigation Company, Limited, and Lamport & Holt, Limited, which are British corporations having places of business in New York City, and was operated between New York and South American ports on a regular schedule carrying passengers and general cargo. She had a load-line mark when she left England, but she had not been in England since 1921, and her English inspection certificate had expired. However, she had been inspected by United States inspectors who had granted her a certificate under which she sailed. On November 10, 1928, the Vestris left New York on her fatal voyage bound for Buenos Aires, Argentina, via Barbados and other ports with

passengers and cargo. Early on the morning of November 11, she encountered heavy weather; the storm increased, and about noon she hove to, with her engines operated at reduced speeds. At about 2:30 in the afternoon of November 12, after most of her passengers and crew had taken to lifeboats, she sank. The disaster resulted in the loss of many lives, the vessel, and cargo.

Taking up for consideration, first, the question of whether the British load-line statutes apply to the Vestris on her voyage from New York to South American ports: The pertinent portion of the British Merchant Shipping Act of 1894, part V, known as the Load-Line Statute, as amended by the Merchant Shipping Act of 1906, reads as follows:

"438: (1) The owner of every British Ship proceeding to sea from a port in the United Kingdom (except ships (a) under eighty tons register employed solely in the coasting trade, (b) ships employed solely in fishing and pleasure yachts) shall, before the time hereinafter mentioned, mark upon each of her sides, amidships within the meaning of the last preceding section, or as near thereto as practicable, in white or yellow on a dark ground, or in black on a light ground, a circular disc twelve inches in diameter, with a horizontal line eighteen inches in length drawn through its centre.

"(2) The centre of this disc shall be placed at such level as may be approved by the Board of Trade below the deck-line marked under this Act and specified in the certificate given thereunder, and shall indicate the maximum load-line in salt water to which it shall be lawful to load the ship."

"439: If a ship is so loaded as to submerge in salt water the centre of the disc indicating the load line, the ship shall be deemed to be an unsafe ship, within the meaning of the provisions hereafter contained in this Part of this Act, and such submersion shall be a reasonable and probable cause for the detention of the ship."

Subdivision 5 of section 440: "When a ship to which this section applies has been marked with a disc indicating the load-line, she shall be kept so marked, or, if the mark has been altered abroad in accordance with regulations made by the Board of Trade for the purpose, marked with the mark as so altered, until her next return to a port of discharge in the United Kingdom."

"442: (1) If—

"(a) any owner or master of a British ship fails without reasonable cause to cause his ship to be marked as by this Part of this Act required, or to keep her so marked, or allows the ship to be so loaded as to submerge in salt water the centre of the disc indicating the load-line; or

"(b) any person conceals, removes, alters, defaces, or obliterates, or suffers any person under his control to conceal, remove, alter, deface, or obliterate, any of the said marks, except in the event of the particulars thereby denoted being lawfully altered, or except for the purpose of escaping capture by an enemy, he shall for each offence be liable to a fine not exceeding one hundred pounds.

"(2) If any mark required by the Part of this Act is in any respect inaccurate so as to be likely to mislead, the owner of the ship shall for each offence be liable to a fine not exceeding one hundred pounds."

"457: If any person sends or attempts to send, or is party to sending or attempting to send a British ship to sea in such an unseaworthy state that the life of any person is likely to be thereby endangered, he shall in respect to each offence be guilty of a misdemeanor, unless he proves either that he used all reasonable means to insure her being sent to sea in a seaworthy state, or that her going to sea in such an unseaworthy state was, under the circumstances, reasonable and justifiable, and for the purpose of giving that proof he may give evidence in the same manner as any other witness.

"If the master of a British ship knowingly takes the same to sea in such an unseaworthy state that the life of any person is likely to be thereby endangered, he shall in respect of each offence be guilty of a misdemeanor, unless he proves that her going to sea in such an unseaworthy state was, under the circumstances, reasonable and justifiable, and for the purpose of giving such proof he may give evidence in the same manner as any other witness."

"459 (which by section 462 is made applicable to foreign ships in British ports): Where a British ship, being in any port in the United Kingdom, is an unsafe ship, that is to say, is by reason of the defective condition of her hull, equipments, or machinery, or by reason of undermanning, or by reason of overloading or improper loading, unfit to proceed to sea without serious danger to human life, having regard to the nature of the service for which she is intended, such ship may be provisionally detained for the purpose of being surveyed or for ascertaining the suffi-

ciency of her crew, and either finally detained or released as follows: * * * "

Sections 1 to 8 of the Merchant Shipping Act of 1906 state that the British load-line provisions shall apply to foreign vessels while in ports. In section 438 the load-line mark is specified and its application described; sections 439–442 prescribe the penalties or remedies in the event of a violation. It is well settled that remedies as distinguished from rights acquired under a foreign statute are controlled by the law where the action is brought, Northern Pacific Railroad v. Babcock, 154 U. S. 190, 197, 14 S. Ct. 978, 38 L. Ed. 958, and the enforcement of a penal law is a matter for the state or country enacting it, Huntington v. Attrill, 146 U. S. 657, 13 S. Ct. 224, 36 L. Ed. 1123.

The section which creates the requirement of a load-line mark expressly states that it applies to "every British ship proceeding to sea from a port in the United Kingdom," and I do not think that the language of the first clause of the section merely indicates the period allowed in which the ship must secure her marks, for a following sentence in the same clause specifically takes care of this by stating that the mark must be placed upon the ship "before the time hereinafter mentioned."

Section 459 re-enforces the idea that the requirement of marking applies only to ships proceeding from British ports as provided in the enacting section 438, for it again refers to a British ship "being in any port in the United Kingdom" which is unsafe by reason of overloading "may be provisionally detained." Section 439 also refers to "the detention of the ship" which is so loaded as to submerge the disc indicating her load line. Detention obviously relates, not to a ship that is arriving, but does have reference to one that is about to depart.

Proctors have cited but one case directly bearing on the question, and I have not succeeded in finding any others to aid me in deciding this important question, and since the construction of a British statute is necessary, their own decisions would be particularly helpful. The one case is Radcliffe v. Buckwell (1927) 2 K. B. 273. The master of the British ship Clavus was charged by the Board of Trade and convicted of unlawfully allowing the ship "at the Victoria Dock Hull" to be loaded so as to submerge the load-line disc contrary to section 442. The Clavus had loaded a cargo of timber at a Finnish port, part of it being carried on deck.

When she left the Finnish port, the disc was about the level of the sea. During the voyage, she encountered a heavy gale and it was necessary to heave to for a day; she listed to starboard and a quantity of water was shipped; she met with heavy weather again in the North Sea. The lumber on deck had absorbed considerable water as it came aboard and when she arrived at Hull it was found that the load-line disc was submerged. Whether the submerging of the disc was due to overloading, or was the result of a peril of the sea, may be open to serious question. However, that is not a matter now for discussion, for it was found as a fact that her master had so loaded her as to cause her disc to submerge, and we are concerned with the construction of the law or statute upon the facts as found. But it is to be observed that the conviction was for allowing the ship to be so loaded as to submerge her disc "at the Victoria Dock, Hull." The opinions were devoted to a discussion of the facts and the application of the act seems not to have been raised. The case can hardly be regarded as a construction of the sections of the act which are now up for consideration.

In the case at bar our concern is, not with fact that when the Vestris originally left Liverpool in 1910 she had her proper "Plimsoll mark" and that she maintained it up to the time she sank, but what is of importance is the legal effect which the mark has upon her loading capacity for this particular voyage. Was she violating the British statute if she loaded so much cargo in New York for a voyage to South American ports that her marks are submerged? This question is quite apart from the one as to whether loading a ship below her marks may be evidence of negligence. The seaworthiness of the Vestris is the fundamental issue of fact in the case, and must be determined upon all the evidence. It seems to me that the requirement of the British statute that ships shall not be loaded so as to submerge the load-line marks applies only to ships proceeding to sea from a port in the United Kingdom, and therefore did not apply to this voyage of the Vestris.

It is quite probable that the various British statutes were drawn with the purpose of requiring all ships, her own as well as foreign ships sailing from her ports, to observe these desirable load-line restrictions. The British load-line statutes were enacted in the interest of the safety of the ships and cargo; they could and were made applicable to all ships, British and foreign ships, sailing from her ports; she could not, of course, impose

this limitation upon foreign ships sailing from other ports. If imposed upon British ships carrying cargo from foreign ports, this might have been regarded as a discrimination against her own ships in the world carrying trade where competition was keen and since, the ships of other nations were not so restricted.

Great Britain had, in the interest of the safety of her ships, taken the lead in putting into effect rules regulating the load line, but until the other maritime carriers of the world were willing to take similar measures, she may have deemed it unwise to extend the application of the statute beyond her own ports. Such exclusion of the application of a beneficial statute affecting ships engaged in the world carrying trade is not new, and like considerations have been recognized on other occasions.

In passing upon the provisions of the Seaman's Act of 1915 prohibiting the advance payment of seaman's wages, the Supreme Court stated in Neilson v. Rhine Shipping Co., 248 U. S. 205, at page 213, 39 S. Ct. 89, 90, 63 L. Ed. 208: "But we are unable to discover that in passing this statute Congress intended to place American shipping at the great disadvantage of this inability to obtain seamen when compared with the vessels of other nations which are manned by complying with local usage."

Proctors for claimants cite the following letters relating to a former voyage of the Vestris as a construction of the British Board of Trade Act of 1894 by the British Executive Department charged with its administration, and the acquiescence by the owners of the Vestris of the right Board of Trade to inquire into the facts and its construction of the act:

"Mercantile Marine Department,
"Board of Trade,
"20, Great Smith Street,
"Westminster, S. W. 1.

"10th November, 1926.
"Gentlemen,

"I am directed by the Board of Trade to state that it appears from the entries in the official log book of the s. s. "Vestris" for the voyage ended on 29th July last, that the freeboard of the vessel on leaving New York on the 29th May was 3 feet 11¼ inches. The centre of the disc is stated to be placed at 5 feet 1½ inches below the upper deck line.

"The Board would be glad if you would obtain from the Master an explanation of this apparent overloading and forward it to this Department together with any observations you may wish to make in the matter.

"I am, Gentlemen,
"Your Obedient Servant
"[Signed] G. E. Baker.

"Messrs Lamport & Holt, Ltd.,
"Royal Liver Building,
"Liverpool."

"15th December, 1926.
"The Assistant Secretary,
"Mercantile Marine Department,
"Board of Trade,
"20, Great Smith Street,
"Westminster,
"London, S. W. 1,
"Ref. M. 14374/26.

"Vestris

"Dear Sir,

"With reference to your letter of the 10th November and our reply of the 13th idem, with regard to this steamer's draft, we enclose herewith copy of a letter which we have received from New York, explaining the reason for the steamer's apparent draft as shown by the log, when leaving New York in May last, and we hope that this explanation of Captain Clark's will be considered satisfactory your committee.

"Yours truly,
"For Lamport & Holt, Ltd.
"Assistant Manager."

"Mercantile Marine Department,
"Board of Trade,
"20, Great Smith Street,
"Westminster, S. W. 1

"M. 14374/26.      4th January, 1927.
"Sir,

"With reference to your letter of the 15th December respecting the freeboard entries in the official log book of the ss "Vestris" I am directed by the Board of Trade to state that they accept the explanation offered by the Master.

"With regard to the Master's statement that the entries had been made by one of the ship's officers, I am to point out that Section 436(3) of the Merchant Shipping Act, 1894, requires the entries to be made by the Master and the Board would be glad if you would be good enough to instruct the Master of the ship in this sense.

"I am, Sir,
"Your Obedient Servant
"[Signed] G. C. Baker.

"The Manager,
"Messrs Lamport & Holt, Ltd.,
"Royal Liver Building,
"Liverpool."

852

As was stated in United States v. Jackson, 280 U. S. 183–193, 50 S. Ct. 143, 146, 74 L. Ed. 361: "It is a familiar rule of statutory construction that great weight is properly to be given to the construction consistently given to a statute by the Executive Department charged with its administration."

However, it does not seem to me that this one instance of a mere inquiry by the Board of Trade is to be held as constituting a "construction consistently given to a statute." This statute has been in force since 1894, and I cannot escape the impression, although perhaps ill-founded, that if the statute had been consistently constructed by the Board of Trade, as claimants contend, there would be, during these many years, ample evidence available and now submitted to substantiate the contention.

▮ Referring now to the question whether actions brought under section 4 of the statute entitled, Death on the High Seas by Wrongful Act of March 30, 1920 (46 USCA §§ 761–768), are subject to limitation of liability:

Section 4 of the Act of March 30, 1920 (46 USCA § 764) reads: "Whenever a right of action is granted by the law of any foreign State on account of death by wrongful act, neglect, or default occurring upon the high seas, such right may be maintained in an appropriate action in admiralty in the courts of the United States without abatement in respect to the amount for which recovery is authorized, any statute of the United States to the contrary notwithstanding."

Section 1 (46 USCA § 761) provides for the right of action for the death of a person occurring on the high seas if caused by neglect, etc., where, by whom, and for whose benefit is to be brought.

Section 2 deals with the amount and apportionment of recovery.

Section 3 states the action must be brought within two years of the wrongful act.

Section 5 provides that the personal representative may be substituted in the event of the plaintiff's death while an action is pending.

Section 6 relates to contributory negligence.

Section 7 excepts from the operation of the statute the Great Lakes, the territorial waters of a state, etc. (46 USCA §§ 762, 763, 765–767).

The last words in section 4 (46 USCA § 764), "without abatement in respect to the amount for which recovery is authorized, any statute of the United States to the contrary notwithstanding" given their usual meaning, are broad and refer to all statutes of the United States. This includes the Limitation of Liability Act, the purpose of which was to reduce recoveries against ship owners and their vessels when the owner is not in privity with the wrong or negligence. "Abatement" is defined in Webster's dictionary and in Bouvier's Law Dictionary as "a reduction," "a decrease," "a diminution." The entire section 4 treats of remedies; providing a remedy in our admiralty courts for the enforcement of rights of action granted under the law of a foreign state. It says the amount of the recovery authorized (by the statute of the foreign state) is not to be reduced by reason of any of our statutes. To say that the abatement or limitation referred only to limitations found in the act, Death on the High Seas by Wrongful Act, is to disregard the words "any statute of the United States to the contrary notwithstanding." The section states that it is "without abatement in respect to the amount for which recovery is authorized. * * *" The use of the words "recovery authorized" connotes that there shall be no abatement of the amount found due. It does not seem to refer to contributory negligence or to the period of time. This appears to be an instance when the legislative history of the act "may be consulted for the purpose of ascertaining the general object of the legislation." Confer Holy Trinity Church v. United States, 143 U. S. 457, 12 S. Ct. 511, 36 L. Ed. 226, for the construction of section 4 is not so entirely free from doubt that any aid derived from the history of the act would be unwelcome.

The attention of Congress was called to this subject by the loss of the La Bourgone which occurred in 1898. The first bill on the subject (N. R. 6143) was first reported by the Judiciary Committee of the House of Representatives, 63rd Session, after the loss of the Titanic in 1912, which contained a section (6) providing that the act should "not affect the rights of shipowners and others to avail themselves of the provisions of the laws of the United States relating to limitation of liability." Amendments were proposed; one to eliminate this section; another by Mr. Graham of Pennsylvania, providing that in all cases brought to limit liability of a foreign vessel owner, where the loss occurred on the high seas and only a foreign vessel or vessels are involved, such limitation should not be greater than that permitted by the statute of the foreign country to which the vessel belongs. The proposed amendments were adopt-

ed; however, the bill failed to pass. Although bills on the subject were introduced in both the Senate and in the House of Representatives in the following session, it was not until the 66th Session when Senate Bill S. 2085, which became the present act (46 USCA §§ 761-768), was reported out by the Judiciary Committee on September 23, 1919, with Senate Report 216, which included the following: "The Committee concludes that this bill (S. 2085) is particularly designed to provide a law of the forum for American Courts in this connection, and a law of the flag for American vessels. But it is clear from the authorities that an action will lie in the United States Courts where the statute of the foreign country where the vessel belongs grants a right of action for death by negligence. But as the Supreme Court has held that the limited liability statute of the United States applies to foreign vessels seeking such limitation of liability in our Courts, the Committee recommends that the bill be amended by the insertion of a new section to be numbered section 4 to read as follows:" (The present section 4 which became a law on March 30, 1920). This history removes any question as to whether Congress was thinking about limitation of liability during the several sessions in which this statute was under consideration; and as to why Congress enacted section 4, the report of their committee which recommended it says: "As the Supreme Court had held that the limited liability statute of the United States applies to foreign vessels seeking such limitation of liability in our courts, the Committee recommends that the bill be amended by the insertion of a new section to be numbered section 4." Then follows the section, and it excludes such foreign vessels from the application of the statutes limiting liability.

Proctors for petitioners contend that since the limitation of Liability Act is not specifically referred to, it is not modified by section 4, but as was said in District of Columbia v. Hutton, 143 U. S. 18, 26–27, 12 S. Ct. 369, 372, 36 L. Ed. 60: "We are not unmindful of the rule that repeals by implication are not favored. But there is another rule of construction equally sound and well settled which we think applies to this case. Stated in the language of this court in U. S. v. Tynen, 11 Wall. 88, 92 [20 L. Ed. 153], it is this: 'When there are two acts on the same subject, the rule is to give effect to both if possible. But, if the two are repugnant in any of their provisions, the latter act, without any repealing clause, operates to the extent of the repugnancy as a repeal of the

first; and even where two acts are not in express terms repugnant, yet if the latter act covers the whole subject of the first, and embraces new provisions, plainly showing that it was intended as a substitute for the first act, it will operate as a repeal of that act.' "

The effect upon foreign vessel owners of section 4, apparently, has not been directly passed upon. In the course of his opinion in The Windrush (D. C.) 286 F. 251, 259, Judge Hazel says: "The contention that section 4 was included to prevent the limitation of liability of a foreign vessel under American statutes is believed not wholly without merit." This point was not directly involved in the case before him and is mere dicta.

In The Annie Faxon (C. C. A.) 75 F. 312, Rev. St. § 4493 (46 USCA § 491), an Act entitled, "Liability of master and owners for damage to passengers," passed subsequent to our original Limitation of Liability Act, was held by the Circuit Court of the Ninth Circuit to limit that act. The court held that the requirements of Rev. St. § 4418 (46 USCA § 392), with respect to the inspection of the boiler had not been complied with and that under Rev. St. § 4493 (46 USCA § 491), the owner was not entitled to limitation of liability where claims of injured passengers were concerned. Rev. St. § 4493 reads: "*Liability of Master and Owners for Damage to Passengers.* Whenever damage is sustained by any passenger or his baggage, from explosion, fire, collision, or other cause, the master and the owner of such vessel, or either of them, and the vessel shall be liable to each and every person so injured, to the full amount of damage if it happens through any neglect or failure to comply with the provisions of this or the preceding chapter or sections 214 or 215, or through known defects or imperfections of the steaming apparatus or of the hull. * * * *" Rev. St. § 4493 did not mention the Limitation of Liability Act. Hines v. Butler (C. C. A.) 278 F. 877, was a case where a fire occurred on a steamer resulting in loss of life of passengers; also loss of their baggage and other merchandise. The Circuit Court of Appeals for the Fourth Circuit found that there was such negligent lack of precaution against fire as to defeat the owner's exemption under the fire statute (R. S. § 4282 [46 USCA § 182]), but that the owner was entitled to limit its liability in respect to the loss of the merchandise under section 4283 (46 USCA § 183), but stated on page 880 of 278 F.: "With regard to the claims of the passengers

for injuries to person, and death injuries, and the loss of baggage, a different question is presented. \* \* \* Interpreting the provisions of the act of 1851 with those of the act of 1871, or sections 4282, 4283, and 4493, together, the construction would appear to be that as they are statutes upon the same subject, that the earlier one creates a general rule of limitation of liability as then existing and the later statute proceeds to make exceptions for the better security and in favor of passengers." The Supreme Court denied certiorari, Hines v. Butler, 257 U. S. 659, 42 S. Ct. 185, 66 L. Ed. 421.

But in Petition of Canadian Pacific Railway Co. (D. C.) 278 F. 180, Judge Neterer originally denied limitation of passenger claims but on a rehearing, granted limitation for passengers and their baggage as well as for cargo, and it may be that that particular statute does not deprive the owners of the right to limitation in respect to claims for personal injury and loss of baggage, but only adds a further condition for the granting of limitation. Cf. Re Petition of Long Island North Shore Passenger & Freight Transportation Co. (D. C.) 5 F. 599.

When the interpretation of section 18 of the Act of June 26, 1884 (46 USCA § 189), and its effect upon the Limitation of Liability Act of March 3, 1851 (9 Stat. 635 [46 USCA § 182 et seq.]) was before the Supreme Court in Richardson v. Harmon, 222 U. S. 96, at page 103, 32 S. Ct. 27, 29, 56 L. Ed. 110:

"No purpose to repeal or qualify any of the terms of the existing liability law is declared, nor is this section declared, in words, to be an amendment of that law. But neither fact is of any marked importance. If the necessary effect be to repeal any part of the former law because of repugnance, that consequence must be declared. So, too, if it be in effect an amendment of the law as it stood, by extending that law to cases not before within it, that effect must be given to it, without any unnecessary disturbance of the qualifications or procedure under the former law.

"The legislation is in pari materia with the act of [March 3] 1851 (9 Stat. at L. 635, chap. 43, § 3), as carried into the Revised Statutes as § 4283 et seq. (U. S. Comp. Stat. 1901, p. 2943), and must be read in connection with that law; and so read, should be given such an effect not incongruous with that law, so far as consistent with the terms of the later legislation."

The Supreme Court held in the case of In re East River Co., 266 U. S. 355, 45 S. Ct.

114, 69 L. Ed. 324, that section 33 of the Jones Act (Act of June 5, 1920, 46 USCA § 688) did not repeal by implication the Limitation of Liability Act insofar as personal injuries or death to seamen were concerned. This section reads: "Recovery for Injury to or Death of Seaman. Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable. \* \* \*" However, the Jones Act quite evidently was passed with the intention of changing the old rule in regard to the fellow servant rule and to put a seaman on a par in this respect with railway employees. Section 33 does not include this vital clause "without abatement in respect to the amount for which recovery is authorized, any statute of the United States to the contrary notwithstanding," or anything to that effect.

Proctors for the petitioners contend that an interpretation of section 4 which denies foreign vessels the right to limitation would result in "arbitrary discriminations and meaningless anomalies." That is so. For instance, it is pointed out, it would result in one kind of limitation applying in the state court and another in admiralty, and different kinds of limitation would apply in the federal courts, depending upon whether the suit was in admiralty or in law. However, there are now many instances where the forum determines the amount of the recovery. One illustration is the different effects given to contributory negligence in common-law courts and in admiralty courts. See Atlee v. Packet Co., 21 Wall. 389, 22 L. Ed. 619; Belden v. Chase, 150 U. S. 674, 14 S. Ct. 264, 37 L. Ed. 1218.

It is true, of course, as proctors for claimants say, that under this interpretation that there is "a subtle preference over the alien competitors" in favor of our own shipowners "at the expense of patrons and operating personnel" in the event of a collision on the high seas between a British ship and an American ship if the American shipowner may limit his

liability and the British owner may not. But this is not new; for instance, the Panama Canal Act prevented the participation of foreign vessels in our coastwise traffic, etc.

The Supreme Court in The Titanic, 233 U. S. 718, 34 S. Ct. 754, 756, 58 L. Ed. 1171, L. R. A. 1916B, 637, referring to a somewhat similar situation, said: "We see no absurdity in supposing that if the owner of the Titanic were sued in different countries, each having a different rule affecting the remedy there, the local rule should be applied in each case. It can be imagined that, in consequence of such diverse proceedings, the owner might not be able to comply with the local requirements for limitation, as it also is conceivable that, if it sought the advantage of an alien law it might as a condition have to pay more than its liability under the law of its flag in some cases. But the imagining of such possible difficulties is no sufficient reason for not applying the statute as it has been construed. * * *"

The reason for the Limited Liability Acts and their policy is explained by Mr. Justice Bradley in Norwich Co. v. Wright, 13 Wall. 104, page 121, 20 L. Ed. 585: "The great object of the law was to encourage ship-building and to induce capitalists to invest money in this branch of industry. Unless they can be induced to do so, the shipping interests of the country must flag and decline."

However, I am not endeavoring to defend the policy or justness of section 4, but merely read it as written by Congress, and after reading and studying it, my conclusion is that actions brought under section 4 are not subject to limitation. Perhaps it may be possible to read into it this country's broad "manifest public policy" in respect to limitation. It is an important question and undoubtedly will be presented to the highest authority for construction.

■■ The third point of law which arises is whether actions upon death claims brought within two years are timely, or whether such actions must be commenced within twelve calendar months. The Vestris was a British ship and those whom the claimants represent were her passengers when she was upon the high seas. Consequently, claimants' rights are based upon an alleged British tort. "The foundation for a recovery upon a British tort is an obligation created by British law." The Titanic, 233 U. S. 718, at page 731, 34 S. Ct. 754, 755, 58 L. Ed. 1171, L. R. A. 1916B, 637. Therefore, the death claimants must rely upon the British statute known as Lord Campbell's Act (9 and 10 Vict., Ch. 93) which reads as follows:

"1. Whensoever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect, or default is such as would (if death had not ensued) have entitled the party injured to maintain an action and recover damages in respect thereof, then and in every case the person who would have been liable if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to felony.

"2. Every such action shall be for the benefit of the wife, husband, parent and child of the person whose death shall have been so caused and shall be brought by and in the name of the executor or administrator of the person deceased; and in every such action the jury may give such damages as they may think proportioned to the injury resulting from such death to the parties respectively for whom and for whose benefit such action shall be brought; and the amount so recovered, after deducting the costs not recovered from the defendant, shall be divided amongst the aforementioned parties in such shares as the jury by their verdict shall find and direct.

"3. Provided always, that not more than one action shall lie for and in respect of the same subject matter of complaint; and that every such action shall be commenced within twelve calendar months after the death of such deceased person."

In section 3, it is provided that every such action shall be commenced within twelve calendar months after the death. As the source of the obligation is this foreign statute, it includes the conditions created by that statute. More precisely stated: "The time within which the suit must be brought operates as a limitation of the liability itself as created, and not of the remedy alone. It is a condition attached to the right to sue at all." The Harrisburg, 119 U. S. 199, page 214, 7 S. Ct. 140, 147, 30 L. Ed. 358. See, also, Davis v. Mills, 194 U. S. 451, 24 S. Ct. 692, 48 L. Ed. 1067; American Law Institute Re Statement of Conflict of Laws, § 433.

The claimants contend that they have the option of suing under section 4 of the United States statute, Death on the High Seas by Wrongful Act (46 USCA §§ 761–768), in which event the period of limitation is one year as prescribed by the foreign statute, or

under section 1 thereof, bringing suit within two years. I am unable to agree with this view. The Presidente Wilson (D. C.) 30 F.(2d) 466, is cited in support of this contention, but this was an action brought in our courts for deaths sustained in a collision on the high seas between an Italian steamship and an American schooner, and justice would be administered in accordance with the laws of the forum. The Scotland, 105 U. S. 24, 26 L. Ed. 1001; The Belgenland, 114 U. S. 355, 5 S. Ct. 860, 29 L. Ed. 152. Accordingly, the Presidente Wilson came within section 1 of the Federal Death on the High Seas by Wrongful Act of March 30, 1920 (46 USCA § 761).

The Buenos Aires (C. C. A.) 5 F.(2d) 425, is also cited by claimants. The representatives of the seamen on the American bark Windrush, who lost their lives in a collision on the high seas between her and the Spanish steamship, the Buenos Aires, brought suit against the Spanish vessel. But as I read the full opinion, it does not seem to me to be an authority for the claimants' contention.

In my judgment, the claimants in the case at bar must rely upon section 4 of our statute, "Death on the High Seas by Wrongful Act," and consequently the twelve calendar months provided in Lord Campbell's Act is the time within which suits must be commenced.